RICHARD DUNCAN *et al.*, Plaintiffs-Appellants, v. BERVIN PETERSON *et al.*, Defendants-Appellees.

Second District   No. 2—04—0911

Opinion filed September 8, 2005.

Richard J. Smith, of Noonan, Perillo & Polenzani, Ltd., of Waukegan, for appellants.

James W. Ford and Stephen A. Kolodziej, both of Brenner, Ford, Monroe & Scott, Ltd., of Chicago, for appellees.

JUSTICE HUTCHINSON delivered the opinion of the court:

Plaintiffs Richard Duncan and Hope Church appeal from the order of the circuit court of Lake County granting the motion of defendants Bervin Peterson, Erwin Lutzer, and The Moody Church for summary judgment and denying plaintiffs' motion for partial summary judgment. See 735 ILCS 5/2—1005 (West 2004). Plaintiffs argue on appeal that the trial court erred in finding that the doctrine of ecclesiastical abstention barred their claims against defendants. We affirm in part, reverse in part, and remand the case for further proceedings.

Duncan, pastor and minister of Hope Church, and Hope Church filed a four-count complaint against Lutzer, senior pastor of The Moody Church; Peterson, chairman of the board of elders of The Moody Church; and The Moody Church. Counts I, II, and III of plaintiffs' third amended complaint (hereinafter complaint) alleged that defendants invaded Duncan's privacy by sending false and misleading letters stating that Duncan could no longer act as a minister and could no longer accept the title of "Reverend," "Pastor," or any other title that would imply that Duncan had credentials for spiritual leadership and ministry. Count IV alleged that defendant Lutzer conspired with Diane Duncan to damage Duncan's reputation by disseminating false and misleading letters so that Duncan would lose his position at Hope Church and not gain custody of the couple's children.

The trial court granted defendants' motion for summary judgment and found that the doctrine of ecclesiastical abstention precluded it from exercising jurisdiction because a determination of the issues would require the court to become involved in interpreting religious doctrine. For the following reasons, we reverse that judgment as to Duncan and remand the case.

The following facts are taken from plaintiffs' complaint. In 1989 Duncan was a member of The Moody Church and was ordained a minister. In 1992 Duncan resigned his membership and his position as a minister of The Moody Church and became senior pastor and a member of an evangelical free church. In 1997 Duncan resigned from the evangelical free church and became senior pastor and chief executive officer of Hope Church, a nondenominational and independent church. Duncan was also ordained by Hope Church in 1997. On April 23, 2000, defendants sent a letter to Duncan, requesting that he respond to "disturbing reports" they received from Al Nader about Duncan's conduct and informing him that if he did not respond they would rescind his ordination. The April 23, 2000, letter listed six charges against Duncan, including the following:

"1. You have had an improper relationship with a divorced single woman, violating the Biblical teaching that an elder be 'above reproach.' ***

2. Your decision to file a divorce petition against your wife violates the Biblical admonition that husbands are to love their wives 'as Christ loves the church[.]' ***

3. Your misuse of alcohol violates the Biblical admonition that an elder be 'temperate, self-controlled.' ***

4. Your misuse of your personal funds as well as the deceitful means used to obtain the Hope Church Bank account, violates Biblical admonition that an elder should not be a 'lover of money.' "

Duncan called John Welch, a member of the board of elders of The Moody Church, and told Welch that the allegations contained in the April 23 letter were investigated by the Hope Church board and determined to be false. Duncan also told Welch that The Moody Church no longer had authority over him because he had resigned his membership and his ministry with The Moody Church in 1992.

On May 5, 2000, a letter signed by defendants Peterson and Lutzer was sent to Duncan, requesting him to appear before The Moody Church's executive committee on May 8, 2000, to respond to the charges set forth in their earlier letter. This later letter also informed Duncan that if he did not appear they would rescind his ordination. Duncan did not appear before the committee. Duncan received a letter dated May 9, 2000, which stated that the licensing and ordination

bestowed upon Duncan by The Moody Church was revoked. The letter also provided:

"Effective immediately, in light of our decision to revoke your licensing and ordination, we now request the following:

1. That you no longer function in the role as minister.

2. That you no longer accept the title 'Reverend' Duncan, or 'Pastor' Duncan, or any other such title that would imply that you have credentials for spiritual leadership and ministry.

3. That you inform the leadership and membership of Hope Church of our action."

The last paragraph of the letter provided:

"You have not left our hearts Rick. We will continue to pray for you asking that God will graciously change your heart so that you may be restored to your wife and those whose trust you have betrayed. 'Seek the Lord while He may be found; Call upon Him while He is near. Let the wicked forsake his way; And the unrighteous man his thoughts; And let him return to the Lord, And He will have compassion on him; and to our God, For He will abundantly pardon.' (Isa. 55:6,7)."

The letter was printed on The Moody Church's letterhead and signed by Peterson as chairman of the board of elders and Lutzer as chairman of the executive committee. At the bottom of the letter it was noted that copies were sent to Robert Dickman, Al Nader, and Al Puccinelli.

Plaintiffs' complaint alleged that as a result of the May 9, 2000, letter over 200 people withdrew membership and attendance from Hope Church under the belief that Duncan could no longer be a minister. Plaintiffs' complaint alleged that Hope Church could no longer pay Duncan's salary or conduct services because of the diminished membership. The complaint further alleged that Duncan could not obtain employment elsewhere as a minister because the letters and/or their contents were disseminated and discussed widely in the evangelical protestant Christian community.

Defendants filed an affirmative defense and a motion for summary judgment. Both pleadings claimed that the letters were based upon their biblical authority over the ordination that The Moody Church bestowed upon Duncan in 1989 and that the first amendment to the United States Constitution prohibits a state court from examining the religious tenets underlying their authority. See *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 49 L. Ed. 2d 151, 162, 96 S. Ct. 2372, 2380 (1976).

Plaintiffs filed a motion for partial summary judgment on defendants' affirmative defense, arguing that the first amendment prohibits a church from imposing religious authority over a person

who has severed his membership. This motion concluded that a determination on the merits did not require an analysis of religious doctrine.

Numerous depositions were taken as part of discovery. At his deposition Duncan testified that he received a master's degree of divinity and a master's degree of theology from Trinity Seminary in the 1980s. Shortly thereafter he was hired as a pastor of evangelism at The Moody Church and ordained by The Moody Church. In 1992 Duncan left The Moody Church to become senior pastor at the Village Church of Lincolnshire, which belonged to the evangelical free church denomination. The Village Church of Lincolnshire allowed Duncan to bypass its year-long ordination process mainly because he was educated at Trinity Seminary, which is the seminary for the Evangelical Free Church of America. Duncan was affirmed as the Village Church of Lincolnshire's ordained minister at a ceremony and Duncan understood it to mean that he was ordained by the Evangelical Free Church. Duncan testified that he received a certificate reflecting this ordination.

Duncan testified that in 1997 he was terminated from the Village Church of Lincolnshire by a vote at an unscheduled congregational meeting. Duncan was never told why he was terminated and was not given the opportunity to request the reasons for his removal. However, Duncan was given a document that stated that his termination was not for reasons of immorality, impropriety, stealing money, or false teachings of sermon. Duncan testified that he subsequently learned that Lutzer had been present at the meeting terminating Duncan's employment and had assisted the Village Church of Lincolnshire with setting up the procedure for the termination.

Duncan testified that he and a small group of people started Hope Church in 1997. Hope Church is a an independent, nondenominational church. Duncan became pastor and he was ordained by Hope Church as required by its constitution. Al Nader, a former Moody Church board member, joined Hope Church early in its formation, as did Robert Dickman and Al Puccinelli. Hope Church continued to grow until 2000. Duncan testified that in 2000 his wife, Diane Duncan, filed for dissolution of marriage. Duncan obtained an order of protection to keep her away from church services and from talking to church members. The Hope Church board investigated charges Diane had made against Duncan, and Duncan testified that he thought the board had cleared him of wrongdoing. In March a Hope Church Sunday service was disrupted by Nader, who threatened Duncan, and the police were called. Duncan subsequently removed Puccinelli from his position as Hope Church's treasurer because Puccinelli returned funds

from the church account to members who had made contributions. Furthermore, Puccinelli's wife appeared on behalf of Diane Duncan at a court hearing, and Puccinelli threatened to stop issuing payroll checks to Duncan. As a result of Duncan's marital trouble many members left Hope Church.

Duncan testified that he received a letter dated April 23, 2000, from The Moody Church, in which it alleged it had received "disturbing reports" from Nader about Duncan's conduct. The letter listed six allegations and stated that the board of elders discussed the charges with three former board members of Hope Church. As stated above, the letter provided that if Duncan did not reply, The Moody Church would rescind the ordination it bestowed upon him in 1989. Duncan contacted John Welch, one of the elders who had signed the letter. Duncan requested the names of the former board members of Hope Church referred to in the letter. Duncan also told Welch that The Moody Church no longer had authority over him because he had resigned his membership and ministry with The Moody Church in 1992. On May 6, 2000, Duncan received a letter signed by Lutzer and Peterson that requested that Duncan come to an executive committee meeting on May 8, 2000, respond to the charges against him, and meet his "accusers." Duncan did not attend the meeting, and he subsequently received the May 9, 2000, letter described above.

Duncan testified that before the May 9, 2000, letter, the Hope Church congregation had grown to about 70 members; however, the Sunday after the letter was disseminated, the congregation dropped down to 5 members. Duncan testified that the day after he received the letter his children's court-appointed guardian *ad litem* told him that she heard he was no longer a minister and questioned him regarding his means for supporting his children. Duncan testified that since the letter was disseminated he has had difficulty continuing his career as a minister. Duncan sent out about 15 resumes for senior pastor positions and received no calls. Duncan testified that the director of placement services at Trinity Seminary was reluctant to allow Duncan to use the Seminary's services to search for new employment, stating that he had heard bad things about Duncan. Duncan testified that Hope Church continues to hold services and that in November 2002 between 10 and 20 members were attending.

At his deposition, Lutzer testified that he spoke with Diane Duncan on several occasions in March and April 2000. Lutzer testified that Diane talked to him about difficulties in her marriage, including her belief that her husband was spending an inordinate amount of time with another woman. Lutzer knew that the Duncans were involved in a dissolution of marriage proceeding, and he was aware

that the court had given custody of the couple's six children to Richard Duncan. However, he did not know when the custody proceedings took place. Also in March 2000, Nader contacted Lutzer and requested advice with reference to problems at Hope Church. Lutzer spoke to Nader, Dickman, and Puccinelli regarding Richard Duncan's activities. Lutzer believed that all three men were members and leaders at Hope Church, though he did not know their positions. The three men told Lutzer that Duncan misused alcohol, spent too much time with a divorced woman, and had changed the signatory on Hope Church's bank account without approval from Hope Church's membership. Lutzer did not make an independent investigation of the allegations or read Hope Church's constitution.

Lutzer thought the allegations were serious because of Duncan's position as a pastor. Lutzer testified that The Moody Church does not have authority to discipline nonmembers; however, because Duncan had been ordained by The Moody Church, Duncan was obligated to abide by The Moody Church's standards for as long as he was ordained. Lutzer acknowledged that this obligation was not written anywhere. Lutzer stated that Duncan was not told that he remained subject to future authority of The Moody Church when he resigned his pastoral position and membership. Lutzer explained that The Moody Church's continuing authority over the ordinations it bestows comes from the Bible.

Lutzer testified that no hearing was held on the allegations against Duncan before the May 9, 2000, letter was sent because Duncan did not appear before the executive committee as requested. Lutzer testified that he did not inform the executive committee of his earlier presence at the Village Church of Lincolnshire's meeting in which the church's membership terminated Duncan's services as pastor. Lutzer testified that he sent all three letters, including the one dated May 9, 2000, to Dickman, Nader, and Puccinelli because he thought they had a right to know the actions taken by The Moody Church and they might have needed to inform others.

Lutzer testified that there was no affiliation between The Moody Church and Hope Church. Lutzer testified that The Moody Church had no authority over Hope Church and it had no right to remove Duncan as pastor or minister of Hope Church. Lutzer testified that it was up to the leadership of Hope Church to decide whether Duncan should be called "Reverend" or "Pastor." Lutzer testified that The Moody Church had no authority to revoke an ordination given by Hope Church.

Lutzer also testified that prior to 2000 there was no mention of the revocation of an ordination in The Moody Church's constitution

nor was there a procedure for relinquishing an ordination. The Moody Church amended its constitution effective April 30, 2000, to add a procedure for revoking an ordination. Lutzer testified that defendants did not follow the new procedure when they revoked Duncan's ordination because they had begun the process with Duncan before the constitution was amended. Lutzer confirmed that he was informed of Duncan's ordination by Hope Church after the May 9, 2000, letter was disseminated. Lutzer admitted that Duncan requested that he clarify the letter to specify that the revocation applied only to The Moody Church ordination and that he refused.

At his deposition, Peterson testified that there was no ecclesiastical relationship between Hope Church and The Moody Church. He admitted that The Moody Church had no authority to remove a pastor from Hope Church and that it was up to the leadership of Hope Church to decide who should be minister or pastor. Peterson testified that The Moody Church has no authority to discipline nonmembers; however, it had biblical authority to revoke Duncan's ordination. Peterson testified that in his 30-year affiliation with The Moody Church he had never heard of another ordination being revoked. Peterson admitted that defendants did not comply with the recently amended constitution when it revoked Duncan's ordination. Peterson also testified that the May 9, 2000, letter applied only to Duncan's ordination by The Moody Church.

At his deposition, Puccinelli testified that he had been on the board of directors of Hope Church but stopped attending the church at the end of March 2000. Puccinelli testified that he interpreted the May 9, 2000, letter to mean that Duncan could no longer be the pastor of Hope Church. Nader testified similarly in his deposition that he believed the letter meant that Duncan could no longer preach. Nader also testified that he sent a letter to two members of Hope Church concerning the action of The Moody Church, along with The Moody Church letters. Nader testified that he believed "that they should take some consideration on attending a church whose pastor lost his ordination and could no longer preach from the pulpit or use the word reverend."

As noted above, the trial court granted defendants' motion for summary judgment, finding that a determination of the issues would necessitate a trier of fact to decide whether defendants followed proper biblical procedure and local church doctrine when it revoked Duncan's ordination and "because the issue of ordination is so heavily steeped in matters of theological import, the application of ecclesiastical abstention is warranted." The trial court further denied plaintiffs' motion for partial summary judgment. Plaintiffs timely appeal both orders.

Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2004); *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284 (2002). "The party opposing summary judgment does not have to prove his or her case, but must present some factual basis arguably entitling him or her to judgment." *Parker v. House O'Lite Corp.*, 324 Ill. App. 3d 1014, 1019 (2001). While summary judgment is encouraged as an aid in the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt. *Parker*, 324 Ill. App. 3d at 1019. We review *de novo* the trial court's ruling on a motion for summary judgment. *Parker*, 324 Ill. App. 3d at 1020.

Initially we note that all four counts of the complaint allege causes of action in which plaintiff Duncan was injured. Counts I, II, and III, as described previously, allege that defendants invaded the privacy of Duncan, and count IV alleges that defendant Lutzer conspired to injure the reputation of Duncan. None of the counts allege injury against Hope Church, and no arguments on behalf of Hope Church are advanced upon appeal. Therefore the judgment granted against plaintiff Hope Church on all four counts of the complaint is affirmed.

■ We now turn to the arguments with respect to plaintiff Duncan. Duncan contends that the trial court erred in granting summary judgment based upon the ecclesiastical abstention doctrine because the doctrine does not bar his claim against defendants. "The first amendment to the Constitution of the United States [citation] bars any secular court from involving itself in the ecclesiastical controversies that may arise in a religious body or organization." *Abrams v. Watchtower Bible & Tract Society of New York, Inc.*, 306 Ill. App. 3d 1006, 1011 (1999). Where resolution of ecclesiastical disputes cannot be made without extensive inquiry into religious law and polity, " 'the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding.' " *Abrams*, 306 Ill. App. 3d at 1011, quoting *Serbian Eastern Orthodox Diocese*, 426 U.S. at 709, 49 L. Ed. 2d at 162, 96 S. Ct. at 2380. Ecclesiastical abstention provides that courts may not determine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity. Rather, civil courts must accept as a given whatever the religious entity decides. See *Serbian Eastern Orthodox Diocese*, 426 U.S. at 710, 49 L. Ed. 2d at 163, 96 S.

Ct. at 2381. In *Abrams,* the plaintiff alleged that the church's body of elders conspired to prevent him from becoming an elder and to force him to leave the organization. The reviewing court found that the complaint was properly dismissed because review of such ecclesiastical and religious decisions, particularly those pertaining to the membership or hiring and firing of clergy, is an "extensive inquiry" into religious law and practice and, therefore, forbidden by the first amendment. *Abrams,* 306 Ill. App. 3d at 1013.

However, courts can resolve a dispute that arises within a church setting if the dispute does not require determination of any doctrinal issues. *Ervin v. Lilydale Progressive Missionary Baptist Church,* 351 Ill. App. 3d 41, 43 (2004). The primary objectives of the first amendment are to assure that the government would not interfere with freedom of worship, that the government would not adopt a state religion, and that the government would not in any way recognize one religion over another. *Bodewes v. Zuroweste,* 15 Ill. App. 3d 101, 103 (1973); see also *McCreary County v. American Civil Liberties Union,* 545 U.S. 844, 860, 162 L. Ed. 2d 729, 746, 125 S. Ct. 2722, 2733 (2005). It is not the intent of the first amendment that civil and property rights should be unenforceable in civil courts simply because the parties involved are the church and members, officers, or the ministry of the church. *Bodewes,* 15 Ill. App. 3d at 103.

Both sides cite to *Guinn v. Church of Christ,* 775 P.2d 766 (Okla. 1989), in support of their positions. In *Guinn,* a former member of the church brought an action against church elders for invasion of privacy and intentional infliction of emotional distress for disciplinary action they took against her before and after she withdrew her membership from the church. *Guinn,* 775 P.2d at 769.

The Oklahoma court found that this was not the sort of private ecclesiastical controversy that the United States Supreme Court has deemed immune from judicial scrutiny. *Guinn,* 775 P.2d at 772, citing *Serbian Orthodox Diocese,* 426 U.S. at 713, 49 L. Ed. 2d at 165, 96 S. Ct. at 2382. The Oklahoma court further opined that because the controversy concerned the allegedly tortious nature of religiously motivated acts and not their orthodoxy in relation to established church doctrine, the justification for judicial abstention was nonexistent and it did not apply to the case. *Guinn,* 775 P.2d at 773.

The supreme court of Massachusetts has similarly stated that "[t]he First Amendment religion provisions contain two concepts, 'freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.' " *Madsen v. Erwin,* 395 Mass. 715, 727, 481 N.E.2d 1160, 1167 (1985), quoting *Cantwell v. Con-*

*necticut*, 310 U.S. 296, 303-04, 84 L. Ed. 1213, 1218, 60 S. Ct. 900, 903 (1940). "Under the banner of the First Amendment provisions \*\*\*, a clergyman may not with impunity defame a person, intentionally inflict serious emotional harm on a parishioner, or commit other torts." *Madsen*, 395 Mass. at 726-27, 481 N.E.2d at 1167.

Illinois courts have reviewed cases involving contract disputes with churches and found that an agreement for wages and benefits is governed by principles of civil contract law and can be enforced by the court. See *Jenkins v. Trinity Evangelical Lutheran Church*, 356 Ill. App. 3d 504, 509 (2005); *Bodewes*, 15 Ill. App. 3d at 103-04. Court intervention is also not prohibited when a church fails to follow the procedures it has enacted. *Ervin*, 351 Ill. App. 3d at 46. In *Ervin*, the reviewing court found that it did not need to interpret religious law to decide whether a church's board violated church bylaws when it terminated Ervin's service as pastor. *Ervin*, 351 Ill. App. 3d at 46. The court found that it could decide the issue by applying neutral legal principles to interpret the church's bylaws, handbook, and covenant. *Ervin*, 351 Ill. App. 3d at 46.

Similarly, Illinois courts may use neutral principles of negligence law in reviewing alleged tortious conduct by churches and their employees. *Biven v. Wright*, 275 Ill. App. 3d 899, 903 (1995). In *Biven*, the plaintiffs, husband and wife, alleged that during the course of marital counseling their minister initiated a sexual relationship with the wife. *Biven*, 275 Ill. App. 3d at 900. The plaintiffs filed a complaint alleging, *inter alia*, that the church was negligent for failing to train and supervise the minister, for failing to warn the congregation of the minister's previous attachments, for creating an unreasonable risk of marital discord among members of the congregation, and for failing to dismiss the minister when it knew or should have known of his attraction to female members of the congregation. *Biven*, 275 Ill. App. 3d at 901-02. The trial court dismissed these allegations for failure to state a cause of action, based upon the constitutional guarantee of the right of free exercise of religion. *Biven*, 275 Ill. App. 3d at 902. The reviewing court found that inquiring into the church's failure to protect the plaintiffs from the sexual misconduct of its minister might not call into question the church's religious beliefs or practices because the minister's sexual misconduct was not rooted in the church's religious beliefs and was outside the boundaries of the church's practices. *Biven*, 275 Ill. App. 3d at 904. The court found, therefore, that resolving the dispute might not require the interpretation of church doctrine or any regulation of ecclesiastical activity and reversed the dismissal. *Biven*, 275 Ill. App. 3d at 904.

Thus, the threshold question in the case at hand is whether Dun-

can's claims can be resolved without inquiry into religious principles and doctrine. The gist of the first three counts of Duncan's complaint is that defendants invaded the privacy of Duncan by sending false and misleading letters. Defendants assert that the letters reflected that they revoked the ordination that The Moody Church had bestowed upon Duncan and that they had "biblical" authority to revoke the ordination. Defendants reason that resolution of Duncan's claims would necessarily require the trial court to examine their doctrinal beliefs concerning The Moody Church's authority to ordain and revoke an ordination. Duncan counters that the trial court would not have to inquire into religious doctrine to determine that: (1) defendants had no authority to revoke the ordination of Duncan, who was no longer a member of The Moody Church; (2) defendants did not follow the procedure set out in The Moody Church's amended constitution when they revoked Duncan's ordination; and (3) defendants' letters appear to revoke Duncan's ability to be a minister and pastor at any church, including Hope Church, which they have no authority to do.

■ We determine that we do not need to inquire into or interpret religious matters to decide whether the May 9, 2000, letter was false and misleading and was a tortious invasion of privacy. We are not required to look at religious doctrine or the biblical underpinnings of The Moody Church's right to revoke an ordination to determine whether defendants' conduct invaded Duncan's privacy by publishing false information. While both sides of this case focus on the religious theory underlying whether the Moody Church had the ability to revoke an ordination of a person who resigned his membership and pastoral position, that is not the harm alleged in the complaint. The harm alleged in the complaint resulted from the alleged conduct of defendants in placing Duncan in a false light when revoking that ordination. Even if the reasoning behind defendants' decision to revoke the ordination bestowed upon Duncan by The Moody Church is not reviewable because it is "steeped in matters of theological import," we may review defendants' conduct in carrying out the revocation. See *Biven*, 275 Ill. App. 3d at 904. Defendants have admitted that they do not have the authority to remove Duncan as a minister or pastor at Hope Church. Deciding whether defendants published a letter placing Duncan in a false light, by appearing to revoke Duncan's ability to be a minister and pastor at Hope Church, does not require extensive inquiry into religious law and polity.

Similarly, a determination of the conspiracy alleged in count IV of the complaint can be accomplished by using neutral principles of law. A court need not interpret religious law or become involved in an ecclesiastical dispute to decide whether Lutzer conspired with others

to injure the reputation of Duncan. Again, the conspiracy claim can be resolved without determining whether The Moody Church had biblical authority to revoke Duncan's ordination and without stepping on the religious liberties protected by the first amendment.

Defendants have also alleged that even if Duncan's claims are not barred by the first amendment, Duncan cannot prove the elements of the invasion of privacy and conspiracy torts alleged in the complaint and therefore the various counts should fail on the merits. Duncan counters that the sufficiency of the evidence was not considered in the ruling on the motion for summary judgment and should not be reviewed here. Although the scope of our review of a summary judgment is limited to the record as it existed at the time the trial court ruled, we are not restricted to the exact reasons the trial court stated or implied in entering its order. *Dunlap v. Alcuin Montessori School*, 298 Ill. App. 3d 329, 338 (1998). We will therefore review whether there is a factual basis upon which Duncan could be entitled to recover.

■ There are four invasion of privacy torts: (1) intrusion upon seclusion of another; (2) appropriation of a name or likeness of another; (3) publication given to private life; and (4) publicity placing another person in false light. *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 416 (1989), citing Restatement (Second) of Torts §§ 652B, 652C, 652D, 652E (1977). Although not specified in the complaint, the alleged wrongdoing describes a cause of action for the tort of placing a person in a false light.

■ Defendants argue that the statements contained in the May 9, 2000, letter, upon which Duncan's allegations were premised, were not false and therefore Duncan's claims must fail. To state a case for the "false light" variety of invasion of privacy, the plaintiff must allege that: (1) the defendant's actions placed the plaintiff in a false light before the public; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *Lovgren*, 126 Ill. 2d at 419-20. Duncan alleges in his complaint that the May 9, 2000, letter was false and misleading as it reflected that The Moody Church had determined that Duncan could no longer be a minister of the gospel and could no longer be the pastor of Hope Church.

Both Lutzer and Peterson acknowledged in their depositions that The Moody Church had no authority over Hope Church. They both agreed that defendants did not have the authority to decide who could minister for Hope Church and that only the leadership of Hope Church had the authority to decide who could be a minister or a pastor for their church. Defendants argue, however, that they took away from

Duncan only what they had bestowed upon him. The May 9, 2000, letter does state that defendants rescinded the ordination that The Moody Church conferred upon Duncan. Nevertheless, a later provision in the letter provides that, in light of their decision to revoke the ordination, they request "[t]hat you no longer function in the role of a minister" and "[t]hat you no longer accept the title 'Reverend' Duncan, or 'Pastor' Duncan, or any such other title that would imply that you have credentials for spiritual leadership and ministry." Both Nader and Puccinelli testified that the letter meant that Duncan could no longer be the pastor for Hope Church and that he could no longer use the title "Reverend." Based upon these conflicting positions, we determine that there is a question of fact as to whether the letter placed Duncan in a false light by portraying him as having been stripped of all right to be a minister.

The May 9, 2000, letter also provided that "[w]e will continue to pray for you asking that God will graciously change your heart so that you may be restored to your wife and those whose trust that you betrayed." Duncan testified that he never had a relationship with another woman and that he did not betray his wife's trust. He also testified that, contrary to the implications of the letter, his wife filed for the dissolution of their marriage. These statements constitute another question of fact.

Defendants also argue that the false light counts must fail because the publicity element of the tort cannot be established. They assert that defendants did not place Duncan "before the public" by sending the letter to Dickman, Nader, and Puccinelli. In *Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill. App. 3d 731, 739-40 (2000), the court noted that although it had never been determined what evidence was sufficient to establish the element of "before the public" for a false light action, the publicity element for a closely related action, public disclosure of private facts, had been previously defined. The publicity element for public disclosure of private facts has been defined as "communication *** 'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.' " *Poulos*, 312 Ill. App. 3d at 740, quoting Restatement (Second) of Torts § 652D (1977); see also *Barrett v. Fonorow*, 343 Ill. App. 3d 1184, 1192 (2003).

The *Poulos* court also noted that an exception to this publicity element has been recognized. *Poulos*, 312 Ill. App. 3d at 740. Publicity may be established by a showing that the disclosure was made to a person or persons with whom the plaintiff has a special relationship. *Poulos*, 312 Ill. App. 3d at 740. The court in *Miller v. Motorola*, 202 Ill. App. 3d 976, 980-81 (1990), which the *Poulos* court found instructive,

provided that a special relationship is present in situations when the communication was made to a particular public such as employees, club members, church members, family, or neighbors. The reasoning for the special relationship exception is that disclosure to a limited number of persons may be just as devastating as disclosure to the general public. *Poulos*, 312 Ill. App. 3d at 740. The *Poulos* court found this reasoning persuasive, and it adopted the exception for false light actions, finding that the publicity element of an action for false light may be satisfied by establishing that the false and highly offensive information was disclosed to a person or persons with whom the plaintiff had a special relationship. *Poulos*, 312 Ill. App. 3d at 740.

■ The *Poulos* court then found that a special relationship existed between the plaintiff, a teacher, and the chairman of the board of trustees of the school board for which he worked. *Poulos*, 312 Ill. App. 3d at 740. Here, the May 9, 2000, letter was sent by defendants to three former board members of Hope Church, *i.e.*, Dickman, Nader, and Puccinelli. The court in *Miller* specifically recognized church members as those who had a special relationship covered by the exception. *Miller*, 202 Ill. App. 3d at 980-81. Neither the evidence nor the complaint was clear as to what relationship Dickman, Nader, and Puccinelli had with Hope Church in May 2000. Nevertheless, publicity to these three men, who within a short period of time had been leaders in Hope Church, would have been just as devastating as publication to the general public because of their close ties to the congregation. We therefore find that there was a special relationship between the recipients of the letter and Duncan. Accordingly, the element of "before the public" is satisfied.

■ Defendants further argue that the false light counts must fail because there is no evidence that the communications were made with actual malice. In actions for false light, actual malice has been defined as knowledge that the statements made by the defendant were false or that such statements were made with a reckless disregard as to their truth. *Poulos*, 312 Ill. App. 3d at 741, citing *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 17-18 (1992).

Lutzer admitted that several weeks after the May 9, 2000, letter was written, he was informed that Duncan had been ordained by Hope Church, and Lutzer was requested to clarify that The Moody Church's action applied only to its 1989 ordination. Lutzer, however, refused. There was also testimony that defendants did not follow their own recently enacted procedures for revoking an ordination, by giving Duncan only two days' notice for the hearing and refusing to give Duncan information regarding the witnesses. The unwillingness of defendants to clarify the letter and their failure to follow their own

procedures could support a finding of malice. We therefore determine that there is an issue of fact as to whether defendants acted with actual malice. See *Moriarty v. Greene*, 315 Ill. App. 3d 225, 237 (2000) (noting that whether defendants acted with actual malice is a question for the jury).

■ We also determine, and defendants do not argue otherwise, that a jury could find that the communication contained in the May 9, 2000, letter would be highly offensive to a reasonable person. Accordingly we find that the pleadings, depositions, and admissions, when viewed in the light most favorable to Duncan, reveal that there are genuine issues as to material facts for the invasion of privacy claims. Therefore, summary judgment on counts I, II and III as to plaintiff Duncan is reversed and the cause is remanded for further proceedings. See *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284 (2002).

■ Defendants also contend that Duncan is unable to provide evidence to support the conspiracy claim alleged in count IV. "Civil conspiracy is defined as 'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.' [Citation.]" *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). In order to state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62-64 (1994). Civil conspiracy is an intentional tort and requires proof that a defendant knowingly and voluntarily participated in a common scheme to commit an unlawful act. *Adcock*, 164 Ill. 2d at 64. A conspiracy is almost never susceptible to direct proof. *Walsh v. Fanslow*, 123 Ill. App. 3d 417, 422 (1984). Conspiracy is usually established from circumstantial evidence and inferences drawn from the evidence. *Adcock*, 164 Ill. 2d at 66.

Lutzer's meetings with Diane Duncan, the revocation-of-ordination hearing, the May 9, 2000, letter, and the divorce proceedings all took place within a 2½-month period. We determine that the close time line, coupled with Lutzer's failure to follow The Moody Church's newly instituted procedures for ordinance revocations and Lutzer's unwillingness to clarify the letter, provide sufficient evidence to leave the conspiracy question for the trier of fact.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County as to plaintiff Hope Church, we reverse the judg-

ment as to plaintiff Richard Duncan, and the case is remanded for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

McLAREN and BYRNE, JJ., concur.