ROBERT STEPEK, Plaintiff-Appellee, v. JOHN DOE, Defendant (John Doe 2, Defendant-Appellant; The Catholic Bishop of Chicago, a Corporation Sole, Third-Party Defendant-Appellant).

First District (3rd Division)   No. 1—08—2140

Opinion filed June 10, 2009.

MURPHY, P.J., specially concurring.

Taylor Miller, LLC, of Chicago (John R. Adams and Frank C. Stevens, of counsel), for appellant John Doe 2.

Burke, Warren, McKay & Serritella, P.C., of Chicago (James A. Serritella, James C. Geoly, and Susan M. Horner, of counsel), for appellant Catholic Bishop of Chicago.

Deutsch, Levy & Engle, Chtrd., of Chicago (Phillip J. Zisook, Brian D. Saucier, and Leon F. Farbman, of counsel), for appellee.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, Reverend Robert Stepek, filed a lawsuit alleging defamation and intentional infliction of emotional distress against defendants John Doe 1 and John Doe 2 (the Does) based on the Does' statements during disciplinary proceedings within the Roman Catholic Church, Archdiocese of Chicago, alleging that plaintiff had sexually abused them as minors. The Does filed claims for contribution and indemnity against the third-party defendant, the Catholic Bishop of Chicago (Catholic Bishop). The Catholic Bishop filed a motion to dismiss plaintiff's claims, pursuant to section 2—619(a)(1) of the Illinois Code of Civil Procedure (735 ILCS 5/2—619(a)(1) (West 2006)). The Catholic Bishop's motion asserted that under the United States and Illinois Constitutions and the Illinois Religious Freedom Restoration Act (775 ILCS 35/1 *et seq.* (West 2006)), the circuit court lacked subject matter jurisdiction over claims arising solely from statements made within the clergy disciplinary process of the Catholic Church (the Church). Doe 2 also filed a motion for summary judgment alleging that the circuit court lacked subject matter jurisdiction.

On February 7, 2008, the circuit court denied the Catholic Bishop's motion to dismiss and Doe 2's motion for summary judgment. The circuit court subsequently denied defendants' motions to reconsider or for the entry of a finding to permit an interlocutory appeal under Supreme Court Rule 308 (155 Ill. 2d R. 308). Defendants then filed motions, pursuant to Supreme Court Rule 383 (155 Ill. 2d R. 383), seeking the entry of a supervisory order directing the circuit court to dismiss plaintiff's complaint for lack of subject matter jurisdiction.

On July 17, 2008, the Illinois Supreme Court granted in part defendants' motions for supervisory order, directing the circuit court to certify for appeal, pursuant to Supreme Court Rule 308, the question concerning subject matter jurisdiction in this case, and directing this court to allow the appeal and answer the certified question. On July 28, 2008, the circuit court certified the following question for interlocutory appeal:

"Whether the circuit court of Cook County has subject matter jurisdiction over causes of action for defamation and intentional infliction of emotional distress arising from allegedly false statements accusing a priest of criminal sexual abuse of children when those statements were made to an ecclesiastical body of the Archdiocese of Chicago convened for the purpose of regulating the clergy[.]"

Defendants timely filed a joint application for leave to appeal on August 8, 2008, and this court allowed the application on August 25, 2008.

## I. FACTUAL BACKGROUND

On June 14, 2002, the United States Conference of Catholic Bishops approved a "Charter for the Protection of Children and Young People," with revisions adopted on November 13, 2002 (USCCB Charter). The USCCB Charter addressed the Catholic Church's commitment to deal appropriately and effectively with cases of sexual abuse of minors by priests, deacons, and other church personnel (*i.e.*, employees and volunteers). In the Charter, the bishops promised to reach out to those who have been sexually abused as minors by anyone serving the Church in ministry, employment, or a volunteer position, whether the sexual abuse was recent or occurred many years ago. The bishops stated that they would be as open as possible with the people in parishes and communities about instances of sexual abuse of minors, with respect for the privacy and the reputation of the individuals involved. They claimed to have committed themselves to the pastoral and spiritual care and emotional well-being of those who have been sexually abused and of their families. In addition, the bishops stated that they will work with parents, civil authorities, educators, and various organizations in the community to make and maintain the safest environment for minors.

In an effort to ensure that each diocese in the United States of America would have procedures in place to respond promptly to allegations of sexual abuse of minors, the United States Conference of Catholic Bishops, on June 14, 2002, also decreed "Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons," revised November 13, 2002 (USCCB Essential Norms). The USCCB Essential Norms constitute particular law for all the dioceses/eparchies of the United States and were deemed complementary to the universal law of the Church, which the Church characterizes as having traditionally considered the abuse of minors a grave delict and punished the offender with penalties, not excluding dismissal from the clerical state if the case so warrants.

The USCCB Essential Norms directed each diocese to establish a written policy on the sexual abuse of minors by priests and deacons, as well as by other church personnel. The USCCB Essential Norms also directed that each diocese designate a competent person to coordinate assistance for the immediate pastoral care of persons who claim to have been sexually abused when they were minors by priests or deacons. The USCCB Essential Norms further authorized each bishop to form an ecclesiastical body in his diocese, a "Review Board," to function as a confidential consultative body to assist and advise the bishop in disciplining clergy accused of the sexual abuse of minors.

In accordance with the USCCB Essential Norms, on July 15, 2003, the Archdiocese of Chicago revised its "Policies for Education, Prevention, Assistance to Victims and Procedures for Determination of Fitness for Ministry" (Policies). The Policies set forth the procedures used by the Archdiocese of Chicago for investigating and responding to reports of sexual abuse of minors. Pursuant to the Policies, a Review Board was established, consisting of nine Roman Catholic members, each appointed by the Archbishop. Six members of the Review Board are lay Catholics who are not employees of the Archdiocese, and three members are clerics. The Review Board serves as "the principal advisor of the Archbishop in his assessment of allegations of sexual abuse of minors and in his determination of suitability for ministry."

The Policies also provide that the Archbishop, with the advice of the Review Board, shall appoint a "Professional Responsibility Administrator" (Administrator). The Administrator's responsibilities include receiving information and allegations of sexual abuse by a cleric with a minor. The Administrator's investigation into such allegations is to include an interview with the person bringing an accusation and the preparation of a written report of the interview. The Administrator is also charged with reporting the allegations to the Archbishop and the cleric facing accusation. The Administrator shall then assess whether interim action should be taken, which can include temporary withdrawal from ministry, monitoring, or restrictions. The Policies also establish an "Assistance Ministry," which is charged with the responsibility of ministering to the needs of victims of sexual abuse and their families.

The Review Board process consists of two principal stages. First, after the Administrator has obtained the pertinent information from the accuser and given the accused a reasonable opportunity to respond, the Review Board shall meet to conduct an "Initial Review." During the Initial Review, the Review Board considers the Administrator's report and other available information. The Review Board then makes a recommendation to the Archbishop regarding whether the cleric

should be removed from ministry pending further investigation. Between 30 days and 180 days after completion of the Initial Review, the Review Board shall then schedule a "Review for Cause." During the Review for Cause, the Review Board shall determine "(1) whether there is reasonable cause to suspect that the accused engaged in sexual abuse of a minor; (2) whether prior determinations as to ministry by the cleric should be altered; and (3) what further action, if any, should be taken with respect to the allegation." The Review Board shall then make a recommendation to the Archbishop of Chicago for formal action, which could include removal from all ministry, restrictions, reinstatement in an unsubstantiated case, and either keeping the file open or closing the file at this stage.

The Archdiocese of Chicago's Office for Child Abuse Investigations and Review (CAIR) is an entity created to assist the Review Board in the performance of its duties. CAIR collects information for the Review Board which may include testimony of witnesses, facilitates the Review Board's meetings and communicates the Review Board's findings to the Archbishop of Chicago. CAIR also reports allegations involving the abuse of a minor to the Department of Children and Family Services (DCFS) and the appropriate prosecuting authority.

Based on the Review Board's findings, the Archbishop then issues a decree. Where the Archbishop finds that there is sufficient evidence that sexual abuse of a minor has occurred, the Congregation for the Doctrine of Faith (CDF) shall be notified. The CDF is the ecclesiastical department having jurisdiction over the review of clergy sexual abuse cases. The CDF may approve the Archbishop's actions, require further investigation, or require a formal trial by a Church tribunal. A formal appellate process is also provided to a cleric, permitting review of both the Archbishop's actions and the verdict of the canonical tribunal.

Plaintiff is a Roman Catholic priest in the Archdiocese of Chicago. Plaintiff was ordained in 1981 and, from 1981 until 1983, plaintiff served as an associate pastor at St. Symphorosa Catholic Church in Chicago (St. Symphorosa). Plaintiff later became pastor at St. Albert the Great Catholic Church in Burbank, Illinois, until he was suspended in November 2006.

In May 2006, the Does, who are brothers, accused plaintiff of sexually molesting them during the time plaintiff was an associate pastor at St. Symphorosa. During that time, the Does were minors and their family members were parishioners at St. Symphorosa.

In his affidavit, Doe 2 stated that in May 2006, he told his friend, Reverend Matthew Foley, a Roman Catholic priest in the Archdiocese of Chicago, that plaintiff had engaged in sexual misconduct with him and his brother, Doe 1, when they were minors. Doe 2 stated that he

requested that Reverend Foley not report this information to anyone. During the week of May 14, 2006, Reverend Foley informed Doe 2 that he had reported the allegations of sexual misconduct by plaintiff to the Archdiocese of Chicago, the Cook County State's Attorney, and DCFS. Doe 2 stated that he expressed his disappointment that Reverend Foley disregarded his request to keep the information confidential. Reverend Foley advised Doe 2 that because the abuse had occurred while the Does were minors, Reverend Foley was obligated to report it. Doe 2 stated that shortly thereafter he was contacted by the Archdiocese of Chicago and DCFS with requests for interviews.

On June 29, 2006, Doe 2 met with the Office of Professional Responsibility of the Archdiocese of Chicago (OPR), now known as CAIR. The report from the meeting reflected that the Administrator and two persons from the Assistance Ministry were also present. At that meeting, Doe 2 was provided with a copy of the Policies and informed that he would have the opportunity to appear before the Review Board to provide any additional information regarding this matter. Doe 2 acknowledged his understanding that DCFS had been contacted. Doe 2 then provided a statement regarding his allegations of sexual abuse. Doe 2 stated that, during the time period between 1981 and 1983 when Doe 2 was approximately 16 years old, plaintiff would often have him sleep over and in the same bed at the rectory of St. Symphorosa. Doe 2 would accompany plaintiff on golf outings and other trips, where they stayed in the same room. Doe 2 stated that on one occasion he stayed at the plaintiff's parent's home, where he watched pornography with plaintiff then slept with plaintiff. Doe 2 also stated that he accompanied plaintiff to a health club, where plaintiff insisted that Doe 2 walk around the locker room naked.

On July 6, 2006, Doe 1 was interviewed by OPR. Doe 1 stated that he was sexually molested by plaintiff. Specifically, Doe 1 stated that when he was in the third or fourth grade he spent the night at the rectory of St. Symphorosa, shared a bed at the rectory with plaintiff, and that on multiple occasions he awoke to plaintiff's hand inside his underwear and fondling him. In his affidavit, Doe 1 stated that he was provided with a brochure that explained the investigation process of the OPR and the Policies. Doe 1 stated that he agreed to the interview with the Archdiocese after the Administrator indicated that the interview would be strictly confidential and his identity would be kept confidential.

The Does' statements to OPR, now CAIR, were presented to the Review Board as part of its evaluation of plaintiff's fitness for ministry. On October 25, 2006, the Review Board conducted a Review for Cause regarding the Does' allegations, in which the Review Board determined

that there was reasonable cause to suspect that the alleged misconduct occurred. As a result, the Review Board recommended that plaintiff not engage in any form of ministry and that appropriate restrictions be imposed in accordance with Archdiocese policies and procedures. The Archbishop of Chicago, Cardinal Francis George, accepted the Review Board's recommendation, issued a decree removing plaintiff from all ministry, and referred the matter to the Congregation for the Doctrine of Faith for further proceedings as required by canon law.

On November 3, 2006, letters were hand-delivered to plaintiff advising him of the Archbishop's decree. On November 28, 2006, plaintiff filed his complaint in this case. In his complaint, plaintiff stated that he has known the Does and their family since 1981. In 1987, Doe 2 was a student at a Chicago undergraduate seminary program and requested a letter of recommendation from plaintiff to further his studies at a graduate seminary program. Plaintiff alleged that after he declined to provide Doe 2 with a letter of recommendation, Doe 2 expressed anger and stated that he would retaliate against plaintiff. In his complaint, plaintiff also stated that in 2001, while he was pastor at St. Albert, he retained a corporation in which the Does were shareholders (the Doe Business) to install air conditioning and related machinery at St. Albert. Doe 1 assisted in the performance of the work on behalf of the Doe Business. In August 2005, following a dispute regarding additional payments requested by the Doe Business, a representative of the Doe Business expressed resentment toward plaintiff and threatened to retaliate against plaintiff.

Plaintiff also stated in his complaint that in the spring of 2006, plans were announced in various church bulletins that a celebration would be held at the end of May to commemorate plaintiff's twenty-fifth anniversary as a priest. Plaintiff alleged that the Does decided to retaliate against plaintiff by "concocting a false and defamatory story" that plaintiff had sexually abused the Does approximately 20 years earlier. Plaintiff alleged that, in June 2006, the Does provided statements to representatives of the Archdiocese of Chicago alleging that plaintiff had sexually abused them when they were minors. Plaintiff alleged that as a result of these false statements, he sustained injury to his reputation and sought compensatory damages in excess of $1 million and an undetermined amount of punitive damages.

On December 31, 2007, Cardinal George issued two decrees, one initiating the ecclesiastical trial of plaintiff, and the second appointing the judges to conduct the trial. On February 14, 2008, a decree was issued by the Very Reverend Patrick R. Lagges, Judicial Vicar of the Archdiocese of Chicago, constituting the tribunal to hear plaintiff's case.

## II. ANALYSIS

### A. Statements Made During Ecclesiastical Proceedings

Both defendants, the Catholic Bishop and Doe 2[1], contend that the circuit court lacks subject matter jurisdiction in this case based on the doctrine of "ecclesiastical abstention" or "church autonomy," protected under the free exercise clause of the first amendment. Defendants assert that the first amendment guarantees religious organizations, such as the Catholic Church, the right to govern its own clergy free from secular court interference. Defendants, therefore, maintain that because the statements underlying plaintiff's claims were made exclusively during clergy disciplinary proceedings, this court should find no subject matter jurisdiction and answer the certified question in the negative.

The first amendment to the Constitution of the United States provides, in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I. The first amendment applies to state governments by incorporation through the fourteenth amendment. U.S. Const., amend. XIV. The United States Supreme Court has held that the basic freedom of religion is guaranteed not only to individuals but also to churches in their collective capacities, which must have "power to decide for themselves, free from [S]tate interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116, 97 L. Ed. 120, 136, 73 S. Ct. 143, 154 (1952).

In *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713, 49 L. Ed. 2d 151, 165, 96 S. Ct. 2372, 2382 (1976), the United States Supreme Court explained that "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." In *Milivojevich*, the United States Supreme Court determined that the Illinois Supreme Court improperly interfered with the decisions of a hierarchical church by reviewing the church's decisions concerning the divestiture of a bishop and the validity of the division of one diocese into three. *Milivojevich*, 426 U.S. at 708-09, 49 L. Ed. 2d at 162, 96 S. Ct. at 2380. The United States Supreme Court explained that the principles limiting the role of civil courts in the resolution of religious controversies that incidentally affect civil rights were initially fashioned in *Watson v. Jones*, 80 U.S. (Wall.) 679, 20 L. Ed. 666 (1872), a diversity case decided

---

[1]Defendant Doe 1 did not file any briefs in this appeal.

before the first amendment had been rendered applicable to the states through the fourteenth amendment. In *Watson*, the United States Supreme Court held:

"[T]he rule of action which should govern the civil courts \*\*\* is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Watson*, 80 U.S. (Wall.) at 727, 20 L. Ed. at 676.

Accordingly, *Milivojevich* held that "[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." *Milivojevich*, 426 U.S. at 725, 49 L. Ed. 2d at 171, 96 S. Ct. at 2387-88. The Court explained, " 'To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church as to decide... religious law [governing church polity] ...would violate the First Amendment in much the same manner as civil determination of religious doctrine.' " *Milivojevich*, 426 U.S. at 709, 49 L. Ed. 2d at 162, 96 S. Ct. at 2380, quoting *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 369, 24 L. Ed. 2d 582 , 584, 90 S. Ct. 499, 500 (1970) (Brennan, J., concurring, joined by Douglas and Marshall, JJ.).

More recently, in *People v. Campobello*, 348 Ill. App. 3d 619 (2004), this court determined that the doctrine of church autonomy did not preclude enforcement of the State's subpoena seeking documents from the Roman Catholic Church regarding the Church's internal investigation of accusations against a priest who was a criminal defendant being prosecuted by the State for sexual assault. *Campobello*, 348 Ill. App. 3d at 629-31. This court rejected the Church's argument that the State's subpoena was an intrusion into the Church's religious activity that ran afoul of the bar against government "review [of] decisions that were reached upon ecclesiastical considerations" and "involve-[ment] in the inner workings of churches." *Campobello*, 348 Ill. App. 3d at 629. In doing so, this court noted that the Church failed to cite an aspect of its administration that the State "threatens to commandeer" where the State sought records from the Church, defendant's employer, for the purpose of gathering evidence in a criminal prosecution against defendant under the laws of Illinois. *Campobello*,

348 Ill. App. 3d at 629. The State neither expressed nor implied an aim to determine for itself whether the defendant violated canon law, much less to override any determination of the Church on that point. *Campobello*, 348 Ill. App. 3d at 629. Accordingly, this court held that the State was allowed access to the Church's records relating to sexual assault allegations against the defendant. See also *Society of Jesus of New England v. Commonwealth*, 441 Mass. 662, 667-68, 808 N.E.2d 272, 278 (2004) (holding that the ecclesiastical abstention doctrine did not preclude enforcement of the Commonwealth's subpoena *duces tecum*, which sought documents from a religious order regarding the criminal defendant, a priest of that order, who was facing criminal prosecution for sexual assault where the matter did not involve resolving a dispute within the church itself).

In *Softcheck v. Imesch*, 367 Ill. App. 3d 148, 157-58 (2006), this court examined the ecclesiastical abstention doctrine within the context of civil lawsuits alleging sexual assault against priests. In *Softcheck,* this court determined that the first amendment did not preclude the circuit court from exercising subject matter jurisdiction over the plaintiffs' tort claims alleging that priests had sexually abused them when they were minors. The complaint alleged that the defendant priests encouraged plaintiffs' faith, trust and reliance upon the priests by assuring plaintiffs that " 'the teachings and instructions of the Church, as given through [defendant priests], were perfect and infallible and superior to imperfect human laws,' " and that " 'adherence to [defendant priests'] teachings and compliance with [their] directions and conduct were in all respects good and beneficial and could cause no harm.' " *Softcheck*, 367 Ill. App. 3d at 151. Defendants argued that the first amendment's free exercise clause prohibited the circuit court from considering plaintiffs' claims where the court would be required to pass judgment on the beliefs and practices of the Catholic Church, specifically those requiring acceptance of hierarchical authority and adherence to church doctrines. *Softcheck*, 367 Ill. App. 3d at 157. In rejecting the defendants' first amendment argument, this court noted that "[n]owhere in plaintiffs' complaints is the court asked to 'pass judgment' on church doctrine." *Softcheck*, 367 Ill. App. 3d at 158. This court therefore held that the circuit court did not err in exercising subject matter jurisdiction over the plaintiffs' claims against the priests. *Softcheck*, 367 Ill. App. 3d at 158.

In *Hiles v. Episcopal Diocese of Massachusetts*, 437 Mass. 505, 773 N.E.2d 929 (2002), the Supreme Judicial Court of Massachusetts considered the ecclesiastical abstention doctrine in the context of a civil lawsuit brought by an Episcopal priest, Hiles, and his wife against the Episcopal Diocese of Massachusetts and the author of a letter ac-

cusing him of having an adulterous affair with her that led to a sexual misconduct investigation by the Diocese. Hiles' complaint alleged defamation, civil rights violations, negligence, intentional infliction of emotional distress and loss of consortium. *Hiles*, 437 Mass. at 506, 773 N.E.2d at 932. Hiles had served as vicar of the Church of Our Savior, an Episcopal mission (mission), which was part of the Episcopal Diocese of Massachusetts (Diocese). The mission had received a bequest of more than $2 million from one of its members and the Diocese demanded that the mission surrender this money, but the mission refused. On at least two occasions, the Bishop of the Diocese asked Hiles to use his influence to persuade the mission to give the bequest to the Diocese, but Hiles remained neutral in the dispute. *Hiles*, 437 Mass. at 508, 773 N.E.2d at 933. Hiles alleged in his complaint that the Bishop warned Hiles that he needed to be "taught a lesson on authority and obedience" and expressed his intention to remove Hiles as vicar of the mission. *Hiles*, 437 Mass. at 508, 773 N.E.2d at 933. Subsequently, a parishioner wrote a letter to the Bishop stating that she and Hiles had a sexual relationship while she was a member of the mission. The Bishop temporarily prohibited Hiles from functioning as a priest pending the outcome of the Diocese disciplinary proceedings. *Hiles*, 437 Mass. at 508-09, 773 N.E.2d at 933. Hiles' complaint alleged that the allegations of sexual misconduct were false, and that the parishioner conspired with the other defendants to destroy Hiles' reputation for the purpose of bringing pressure on the mission to relinquish its bequest to the Diocese. *Hiles*, 437 Mass. at 509-10, 773 N.E.2d at 933.

The Supreme Judicial Court of Massachusetts held that Hiles' claims for defamation, conspiracy, and civil rights violations were barred by the first amendment. The Massachusetts court determined that Hiles' defamation claim arose from the parishioner's letter which was published solely in a canonical context. *Hiles*, 437 Mass. at 512, 773 N.E.2d at 936. The court explained that the letter supplied the basis to initiate the Episcopal Church's internal disciplinary proceedings and, thus, became inextricably part of those internal proceedings. As a result, the court stated "[w]e are bound to step aside and permit the Church to consider the veracity of [the parishioner's] charge through that process." *Hiles*, 437 Mass. at 513, 773 N.E.2d at 936.

The *Hiles* court also explained that both Hiles, as an ordained priest of the Episcopal Church, and the parishioner acceded to the canons of the Episcopal Church and were bound by them. *Hiles*, 437 Mass. at 513, 773 N.E.2d at 936, quoting *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 114, 97 L. Ed. 120, 136, 73 S. Ct. 143, 153 (1952) (" '[t]he right to organize voluntary religious associations ***

for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it' ''). The *Hiles* court found that Hiles' defamation claim against the parishioner touched the core of the church-minister relationship where the Episcopal Church, like others, has a singular interest in protecting its faithful from clergy who will take advantage of them. *Hiles*, 437 Mass. at 513, 773 N.E.2d at 936. The court held:

> "For purposes of the First Amendment, a parishioner victim who invokes the Episcopal Church's internal disciplinary process may invoke as her own freedom of belief the church's right to be free from State court interference in that process. The First Amendment's protection of internal religious disciplinary proceedings would be meaningless if a parishioner's accusation that was used to initiate those proceedings could be tested in a civil court." *Hiles*, 437 Mass. at 513, 773 N.E.2d at 936-37.

The *Hiles* court explained that its analysis was predicated on the fact that the only defamatory publication allegedly made by the parishioner was made to the church itself, within its internal disciplinary procedure. The court indicated that the absolute first amendment protection for statements made by a church member in an internal church disciplinary proceeding would not apply to statements made or repeated outside that context. *Hiles*, 437 Mass. at 513 n.12, 773 N.E.2d at 937 n.12. However, since Hiles' complaint made no allegations that the parishioner repeated her allegedly defamatory statements to any other persons or in any other forum, the absolute first amendment protection applied in that case. *Hiles*, 437 Mass. at 513 n.12, 773 N.E.2d at 937 n.12.

Following *Hiles*, the Supreme Judicial Court of Massachusetts again considered the first amendment protection for matters involving internal church proceedings in *Callahan v. First Congregational Church of Haverhill*, 441 Mass. 699, 808 N.E.2d 301 (2004). In *Callahan*, an interim pastor, Callahan, filed a lawsuit against his employer, the First Congregational Church of Haverhill, and its officers after Callahan's privilege to be a minister was suspended. *Callahan*, 441 Mass. at 700, 808 N.E.2d at 303. The *Callahan* court determined that the free exercise clause of the first amendment prohibited the trial court from exercising subject matter jurisdiction over Callahan's claims for discrimination, breach of contract, tortious interference, intentional infliction of emotional distress and violation of right to privacy where the court could not have inquired into the reasons for the church's decisions regarding Callahan's ministry without intrud-

ing into matters of internal management of the church. *Callahan*, 441 Mass. at 711-15, 808 N.E.2d at 310-13. The *Callahan* court also found that the free exercise clause prohibited the trial courts from exercising jurisdiction over Callahan's defamation claims against the church and its officers, to the extent that they arose from the ecclesiastical complaint, investigation, and church committee decision regarding Callahan. The court explained that because those defamation claims arose solely from actions that are " 'inextricably part of the Church disciplinary process,' " the claims lie outside the jurisdiction of the court. *Callahan*, 441 Mass. at 715-16, 808 N.E.2d at 313-14, quoting *Hiles*, 437 Mass. at 514, 773 N.E.2d at 937.

However, the *Callahan* court determined that the free exercise clause did not prohibit the trial court from exercising subject matter jurisdiction over Callahan's defamation claim against the church's "forum leader," based on the leader's alleged statements that Callahan had an inappropriate relationship with a seminarian, engaged in "bizarre behavior," and "breached a confidence involving a moderator and a seminarian." *Callahan*, 441 Mass. at 716-17, 808 N.E.2d at 314. The court noted that the leader did not play any role in the church's disciplinary procedure against Callahan and that it was possible that some of the alleged statements fell outside the church disciplinary process. *Callahan*, 441 Mass. at 717, 808 N.E.2d at 314-15. The court explained that " '[t]he absolute First Amendment protection for statements made by a church member in an internal church disciplinary proceeding would not apply to statements made or repeated outside that context.' " *Callahan*, 441 Mass. at 716, 808 N.E.2d at 314, quoting *Hiles*, 437 Mass. at 513 n.12, 737 N.E.2d at 937 n.12. Therefore, the *Callahan* court concluded that because some of the alleged statements by the leader may have been outside of the church's internal proceedings, the trial court did not err in refusing to dismiss Callahan's defamation claim against the leader as to these statements. *Callahan*, 441 Mass. at 717, 808 N.E.2d at 314-15.

In *Cimijotti v. Paulsen*, 230 F. Supp. 39, 41 (N.D. Iowa 1964), the district court similarly determined that the first amendment precluded a slander action based solely upon statements made to the Catholic Church before its recognized officials and under its disciplines and regulations. In *Cimijotti*, a husband filed an action against his former wife and two other women for conspiracy to damage his person, reputation and property based on statements made by the defendants to the Catholic Church so that one of the defendants could obtain sanctions from the Church for separate maintenance and divorce. *Cimijotti*, 230 F. Supp. at 41. The *Cimijotti* court explained, "The freedom of speech does not protect one against slander, yet a person must be free to say

anything and everything to his Church, at least so long as it is said in a recognized and required proceeding of the religion and to a recognized official of the religion." *Cimijotti*, 230 F. Supp. at 41. While the court noted that the communication "might be actionable if made outside strictly religious activities," there was nothing to indicate that the defendants had made communications to third persons. *Cimijotti*, 230 F. Supp. at 41.

In the present case, the basis of plaintiff's claims for defamation and intentional infliction of emotional distress were the Does' statements to OPR, now CAIR, which were presented to the Review Board as part of its evaluation of plaintiff's fitness for ministry. These statements were published solely in a canonical context and supplied the basis for the Doe defendants' initiation of disciplinary proceedings against plaintiff under the Policies of the Archdiocese of Chicago for investigating and responding to reports of sexual abuse of minors. Accordingly, the Doe defendants' statements were used to invoke the Catholic Church's internal disciplinary procedures and became part of the internal disciplinary proceeding. This court is obligated to refrain from interfering with the Church's ability to consider the veracity of the Doe defendants' charges through that process. See *Milivojevich*, 426 U.S. at 725, 49 L. Ed. 2d at 171, 96 S. Ct. at 2387-88 (where a religious organization established an ecclesiastical tribunal to decide disputes involving internal discipline and government, the Constitution requires that civil courts accept their decisions as binding upon them); see also *Hiles*, 437 Mass. at 513, 773 N.E.2d at 937 (civil courts are prohibited from interfering in a church's internal disciplinary process).

In addition, plaintiff, as an ordained priest, and the Does, as parishioners, acceded to the Policies of the Archdiocese of Chicago and are bound by them. See *Hiles*, 437 Mass. at 513, 773 N.E.2d at 936. Plaintiff's defamation claim concerns the core of the church-minister relationship. While the Catholic Church's interest is not exclusive, the Church does have a strong interest in protecting minors from sexual abuse at the hands of clergy. For purposes of the first amendment, parishioner victims, such as the Does, who invoke the Catholic Church's internal disciplinary process may also invoke their belief in the Church's right to be free from State court interference in that process. As the *Hiles* court noted, "The First Amendment's protection of internal religious disciplinary proceedings would be meaningless if a parishioner's accusation that was used to initiate those proceedings could be tested in civil court." *Hiles*, 436 Mass. at 513, 773 N.E.2d at 937. Indeed, "a person must be free to say anything and everything to his Church, at least so long as it is said in a recognized and required

proceeding of the religion and to a recognized official of the religion." *Cimijotti*, 230 F. Supp. at 41. Since the only defamatory publication allegedly made by the Does was made to the Church itself within internal disciplinary proceedings, the absolute first amendment protection for statements made by Church members in an internal church disciplinary proceeding precludes the circuit court from exercising jurisdiction in this matter. *Callahan*, 441 Mass. at 716, 808 N.E.2d at 314; *Hiles*, 436 Mass. at 513 n.12, 773 N.E.2d at 937 n.12; *Cimijotti*, 230 F. Supp. at 41.

Plaintiff relies on the decision by the Court of Appeal of Louisiana in *Hayden v. Schulte*, 701 So. 2d 1354 (1997), in support of his argument that the circuit court may exercise subject matter jurisdiction over a lawsuit alleging that false allegations of sexual abuse had been brought against church personnel. In *Hayden*, a priest sued his archbishop and archdiocese alleging damage to his reputation and loss of employment. The priest alleged that defamatory information about child molestation accusations against him was provided to the media by church officials. *Hayden*, 701 So. 2d at 1356. The *Hayden* court determined that the priest's allegations were sufficient to state a claim within the subject matter jurisdiction of state courts where the priest alleged that the defamation had been intentionally disseminated outside the church. *Hayden*, 701 So. 2d at 1356-57. The *Hayden* court explained:

> "It is one thing to say that churches must be free of governmental interference to conduct matters of internal discipline and organization, even when those matters touch upon the reputations of those affected. It is quite another to say that churches have the unfettered right to make unsubstantiated statements of an essentially secular nature to the media destructive of a priest's character as we read Father Hayden's petition alleges occurred in this case." *Hayden*, 701 So. 2d at 1357.

Unlike *Hayden*, where the alleged defamatory information was disseminated outside the church, plaintiff in this case does not allege that the Does' alleged defamatory statements were communicated to other third persons. Rather, plaintiff's defamation and intentional infliction of emotional distress claims were based on the Does' statements, which were published solely within the Catholic Church's internal disciplinary proceedings. We therefore find plaintiff's reliance on *Hayden* unavailing.

Plaintiff also cites this court's determination in *Duncan v. Peterson*, 359 Ill. App. 3d 1034 (2005), in support of his argument that the circuit court may exercise subject matter jurisdiction over his claims. In *Duncan*, a pastor, Duncan, filed a false light invasion of privacy and

conspiracy action against his former church, The Moody Church, and the chairman of the church's board of elders, after the Moody Church revoked the pastor's ordination when he filed for divorce. *Duncan*, 359 Ill. App. 3d at 1037. The Moody Church sent Duncan a letter requesting that he respond to charges, including that: he had an improper relationship with a divorced single woman " 'violating the Biblical teaching that an elder be "above reproach" ' "; his decision to file a divorce petition against his wife " 'violat[ed] the Biblical admonition that husbands are to love their wives "as Christ loves the church" ' "; he misused alcohol in violation of Biblical admonition; and he misused personal funds in violation of Biblical admonitions. *Duncan*, 359 Ill. App. 3d at 1037. Duncan informed The Moody Church that it no longer had authority over him because he had resigned his membership and his ministry with that church and had become senior pastor of a new church, Hope Church. *Duncan*, 359 Ill. App. 3d at 1037. The Moody Church subsequently issued a letter indicating that Duncan could no longer function in the role as minister. Duncan alleged that as a result of the letter, parishioners withdrew from membership in Hope Church and that he could not obtain employment elsewhere as a minister because the letters were disseminated and discussed widely in the evangelical protestant Christian community. *Duncan*, 359 Ill. App. 3d at 1038. This court held that the doctrine of ecclesiastical abstention did not preclude jurisdiction over Duncan's claims where the pastor's claims could be resolved without inquiring into religious principles and doctrine or intervening in a church's affairs. *Duncan*, 359 Ill. App. 3d at 1046.

We find *Duncan* distinguishable from the present case. In *Duncan*, the pastor's claims were based on a letter that he alleged was disseminated and discussed widely in the evangelical protestant Christian community. *Duncan*, 359 Ill. App. 3d at 1038. Further, it was uncontested that the pastor had resigned from The Moody Church prior to the letter being sent. Therefore, the First Amendment protection for statements made by church members in an internal church disciplinary proceeding was not implicated in *Duncan*.

### B. Neutral Principles of Law

Plaintiff contends that the circuit court is not precluded from exercising subject matter jurisdiction over his defamation claim where the issue does not involve an interpretation of church doctrine and may be resolved by applying a "neutral principles of law" approach.

Illinois courts have generally refused to decide cases that require a judicial interpretation of religious doctrine or church law. *Hines v. Turley*, 246 Ill. App. 3d 405, 417 (1993). However, where doctrinal

controversy is not involved in a church dispute, mandatory deference to religious authority is not required by the first amendment and the court may choose from a variety of approaches to resolve the dispute. *Hines*, 246 Ill. App. 3d at 418. Thus, in disputes over church property, Illinois courts have applied a "neutral principles of law" approach, objectively examining pertinent church characteristics, constitutions and bylaws, deeds, state statutes, and other evidence to resolve the matter the same as it would a secular dispute. *Hines*, 246 Ill. App. 3d at 418.

While it is possible that resolution of plaintiff's claims would not require any interpretation of the Catholic Church's doctrine, resolving this dispute would involve the secular court interfering with the Church's internal disciplinary proceedings where plaintiff's claims are based on the Does' statements, which were provided solely within the Church's proceedings. Irrespective of the fact that a court or jury could apply "neutral principles of law" to the Does' alleged statements to determine whether they were defamatory, those statements were published exclusively within the context of the Church's disciplinary proceedings. Therefore, as previously discussed, this court is bound to step aside and permit the Church to consider the veracity of the Does' charges of sexual abuse through the Church's process.

Plaintiff, nonetheless, relies on this court's decision in *Bivin v. Wright*, 275 Ill. App. 3d 899 (1995), to support his argument that the circuit court may exercise subject matter jurisdiction in this case under the neutral principles of law approach. In *Bivin*, the plaintiffs, a married couple, alleged that in the course of marital counseling, their minister engaged in a sexual relationship with the wife. *Bivin*, 275 Ill. App. 3d at 900. The married couple filed a lawsuit that included a negligent supervision claim against the minister's church. The sole issue before this court was whether the negligent supervision claim was barred by the first amendment. *Bivin*, 275 Ill. App. 3d at 902. This court determined that the tort underlying the negligence claim, the alleged sexual misconduct of a clergy member, was "not rooted in the church's religious beliefs and was outside the boundaries of the church's ecclesiastical beliefs and practices." *Bivin*, 275 Ill. App. 3d at 904. Thus, this court found that resolving the dispute "may not require any interpretation of church doctrine *or* any regulation of ecclesiastical activity." (Emphasis added.) *Bivin*, 275 Ill. App. 3d at 904. This court therefore concluded that the circuit court abused its discretion in dismissing the plaintiffs' complaint for failure to state a cause of action based on the guarantees of the first amendment. *Bivin*, 275 Ill. App. 3d at 904.

Unlike the plaintiffs' claim in *Bivin*, resolving the dispute in the present case would require the secular court to involve itself in the "regulation of ecclesiastical activity." Here, plaintiff's claims are based on statements made solely within the context of the Church's internal disciplinary proceeding. The circuit court is therefore precluded under the first amendment from exercising jurisdiction in this matter.

## C. Illinois Religious Freedom Restoration Act

Defendant Catholic Bishop also contends that the circuit court's exercise of subject matter jurisdiction would violate the Illinois Religious Freedom Restoration Act (Act) (775 ILCS 35/1 *et seq.* (West 2006)), by interfering with the Catholic Church's clergy disciplinary proceedings. The Act provides that "Government may not substantially burden a person's exercise of religion, *** unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." 775 ILCS 35/15 (West 2006). We note that this issue was not well developed by the parties on appeal and do not reach it in deciding this matter.

For the above reasons, we answer the certified question in the negative.

Certified question answered.

COLEMAN, J., concurs.

PRESIDING JUSTICE MURPHY, specially concurring:

I concur that this court is precluded from exercising subject matter jurisdiction over plaintiff's claims. I write separately to suggest that when accusers are not members of the religious body to which they complain, the first amendment principles described by the majority should apply equally to their testimony.

In the cases cited by the majority, the first amendment extends to a member of a religious body who reports a clergyman's misconduct to church officials, who use the information to discipline the minister. In *Hiles v. Episcopal Diocese of Massachusetts*, 437 Mass. 505, 773 N.E.2d 929 (2002), for example, the court held that the plaintiff's defamation claim "touches the core of the church-minister relationship" because the church "has a singular interest in protecting its faithful from clergy who will take advantage of them." *Hiles*, 437 Mass. at 513, 773 N.E.2d at 936. Pivotal to this analysis was the fact that the statement was made by a church member to the church itself. *Hiles*, 437 Mass. at 513 n.12, 773 N.E.2d at 937 n.12.

However, the parishioner's accession to the canons of the Episcopal Church was an independent basis for the court's opinion in *Hiles*. The first basis for the court's ruling regarding subject matter jurisdiction was that "[o]nce a court is called on to probe into a religious organization's discipline of its clergy, the First Amendment is implicated. [Citations.] When that occurs, principles of church autonomy deprive the court of subject matter jurisdiction." *Hiles*, 437 Mass. at 511, 773 N.E.2d at 935. See also *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696, 724-25, 49 L. Ed. 2d 151, 171, 96 S. Ct. 2372, 2387-88 (1976); *People v. Campobello*, 348 Ill. App. 3d 619, 628 (2004). None of the authority cited by the majority *require* that an accuser who makes statements in the context of a religious disciplinary proceeding be a member of the religious body to which the clergyman in question belongs.

Therefore, even if the accuser is not a member of the religious body to which he complains, his statements may still require the court to inquire into the religious body's discipline of its clergy. Such an inquiry implicates the free exercise clause of the first amendment. See *Hiles*, 437 Mass. at 511, 773 N.E.2d at 935.