2019 IL App (1st) 173143

FIRST DISTRICT
SIXTH DIVISION
May 10, 2019

No. 1-17-3143

| | |
|---|---|
| CONNIE NELSON, LONA JEAN WILSON, HENRY WILSON, MICHAEL CAMPBELL, MARY SYKES, TRACEY SIKES, IDA YOUNG, MARY COOPER, SARA HUNT, DAZELLE KIDD, ROCHELLE RILES, LUTHER RILES, LAWRIN RILES, CARRIE SIMS, ROSELLA JOHNSON, GLORIA D. JOHNSON, MATTIE PRESTON, SADIE BROWN, JOURDAN HUNT, MILLIE BRIDGES, DR. LAWRENCE HAMILTON, MAHALIA ANN JOHNSON, DAYNOR LAMB, LEOLA THOMAS, and SARA THOMPSON, individually and as members of The Prayer Tabernacle Church of Faith, Inc., an Illinois Not-For-Profit Corporation, <br><br>     Plaintiffs-Appellees, <br><br> v. <br><br> SHAUNTÉ BREWER, FLETCHER BREWER, EDNA JENKINS-BREWER, ROBERT McGRIFF, and THE NEW PRAYER TABERNACLE CHURCH, an Illinois Not-For-Profit Corporation, <br><br>     Defendants-Appellants. | Appeal from the Circuit Court of Cook County. <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> No. 11 CH 6631 <br><br><br><br><br><br> Honorable <br> Diane Joan Larsen, <br> Judge Presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court with opinion.
Justices Cunningham and Harris concurred in the judgment and opinion.

## OPINION

¶ 1    The individual plaintiffs, members of the Prayer Tabernacle Church of Faith, Inc. (PTC), an Illinois not-for-profit corporation, sued the individual defendants and the New Prayer Tabernacle Church (New PTC), an Illinois not-for-profit corporation, for declaratory relief and forcible detainer. Plaintiffs sought a declaration that Michael Campbell was the duly elected

pastor of the church and that certain individual plaintiffs were duly appointed as officers and directors of the church. Plaintiffs also sought a declaration that the individual defendants are not officers or directors of the church and that Shaunté Brewer is not the pastor of the church. Finally, plaintiffs sought actual possession of PTC property consisting of the church premises and the rectory. Defendants filed a four-count verified counterclaim based upon the same underlying facts, alleging tortious interference with a contract, defamation *per se*, breach of fiduciary duty, and civil conspiracy.

¶ 2       Following a bench trial, the circuit court entered a detailed order finding, among other things, that (1) there was no properly constituted board of directors and no properly elected or appointed officers for PTC, so that neither plaintiffs nor defendants were properly elected or appointed in such capacities; and (2) plaintiffs and defendants have an equal right to the possession and control of PTC property pending an election of a duly constituted board of directors. The court specifically stated that it was not issuing an opinion as to who is the rightful pastor "because this question is religious in nature." The court ordered the appointment of a custodian for PTC to conduct the election of an initial board of directors, draft proposed amended articles of incorporation and amended bylaws, and ensure the proposed corporate governing documents comply with Illinois statutes concerning not-for-profit corporations. In addition, the court determined that the initial board of directors should consist of five persons instead of four in order to avoid a deadlock, and that the remaining plaintiffs and defendants each individually have a right to vote for the initial board of directors. The court entered judgment in favor of defendants on plaintiffs' claim for forcible detainer. Finally, the court found in favor of plaintiffs on all of defendants' counterclaims.

¶ 3    In this appeal, defendants argue the circuit court lacked subject matter jurisdiction to enter the order requiring the remaining plaintiffs and defendants to vote for an initial board of directors and the election of a fifth board member, and the later orders implementing or enforcing them. Defendants also argue that the court lacked subject matter jurisdiction to conclude that plaintiffs and defendants have equal possession of PTC property. Defendants do not appeal the court's findings on their counterclaims. We affirm.

¶ 4                                    BACKGROUND

¶ 5    On May 18, 1965, the church first filed articles of incorporation with the Illinois Secretary of State under the General Not For Profit Corporation Act of 1986 (Act) (805 ILCS 105/112.50(b)(4) (West 2014)), initially as the Prayer Tabernacle Church of God in Christ, Inc. The articles of incorporation listed four board members, one of whom was the pastor and founder of the church, Reverend R.J. Roff. However, the articles of incorporation did not specify a term of office for the church's board of directors, the mechanism to select board members, nor criteria for church membership.

¶ 6    On March 30, 1973, the church filed articles of amendment to the articles of incorporation with the Illinois Secretary of State. A certificate of amendment was duly issued on the same date changing the name of the church to Prayer Tabernacle Church of Faith, Inc. The amended articles of incorporation indicated that four members had voting rights with respect to amendments. On September 21, 1979, the church filed a certificate of change of registered office with the Illinois Secretary of State, which reflected a change of address for the registered office to 9521-35 South Prospect Avenue in Chicago.

¶ 7    On September 18, 1995, Reverend Roff executed a deed for the church property in Chicago, which was recorded with the Cook County Recorder of Deeds on September 29, 1995

granting the property to a land trust. Title for PTC's building at 2907 South Fourth Street in Rockford, Illinois, was conveyed into the land trust by deed executed by Reverend Roff on October 24, 1997 and recorded with the Winnebago County Record of Deeds on December 3, 1997. PTC is the beneficial owner of the land trust. The land trust does not contain a contingent beneficiary. Reverend Roff held the power of direction in the trust. Standard Bank has acted as the trustee for the land trust since it was executed and kept a copy of PTC's bylaws in its files to identify who may give direction with respect to the trust in case of succession.

¶ 8    Article VIII of the PTC bylaws states:

>     "The General Bishop (and President of Corporation) Bishop R. J. Roff retains his authority during his lifetime. In the event that Bishop R. J. Roff becomes incapacitated, the Assistant Pastor shall become the Acting Pastor until such time as the body of Tabernacle Church of Faith elects a pastor. Such election shall occur within six (6) months from the date of appointment of acting pastor.

>     Once the Assistant Pastor is appointed and fills the position of Acting Pastor, his position as chairman of the board will automatically terminate.

>     The Board of Directors shall be appointed by Bishop R.J. Roff."

¶ 9    Article X of the bylaws provides that all church property "shall be held in trust by the Standard Bank & Trust Co., acting as General Trustee having title for Prayer Tabernacle Church of Faith, Inc."

¶ 10    Article XI is entitled "The General Assembly (Officers)," and states that the board of directors "is the only doctrine-expressing law making authority of the church." Article XI provides that "[t]he officers of the corporation shall be a president, vice-president, treasurer, a financial secretary, corporate secretary and two board member [*sic*] who may be appointed by

4

Bishop R.J. Roff." For terms of office, it states "[t]he officers of the corporation shall be appointed annually by the president at the first meeting of the board of directors. If the appointment shall not be held at such meeting, such appointment shall be held as soon thereafter as conveniently as may be. Vacancies may be filled or new offices created and filled at any meeting of the board of directors. Each officer shall hold office until his successor shall have been duly appointed and shall have qualified or until his or her death or until he/she resigns or shall have been removed in the manner hereinafter provided." In short, the bylaws provided that Reverend Roff appoint board members, but did not include a provision on succession of either officers or board members in the event of his death or incapacitation. Further, the bylaws did not mention whether Reverend Roff had the authority to appoint board members in his capacity as president or individually as the pastor.

¶ 11    Plaintiff Connie Nelson joined PTC in 1987 and was active in the church's programs. Reverend Roff appointed her as treasurer and she was authorized, with an additional signatory, to sign checks drawn on the PTC's account at Standard Bank. On October 9, 1997, PTC executed a "living trust," as part of a resolution of the board of directors, which authorized the treasurer of the church to pay expenses associated with funeral services of Reverend Roff upon his passing. Defendant Edna Jenkins-Brewer joined PTC in the 1960s, was appointed secretary of PTC in September 2000, and reappointed annually thereafter.

¶ 12    PTC's annual reports dating back to 2002 listed the names of officers and directors serving in the church's leadership. For instance, in 2002, Reverend Roff was listed as the president, but not as a director. Jenkins-Brewer was listed as the secretary. Nelson was listed as the treasurer. Plaintiff Dr. Lawrence Hamilton is the only listed director although the form for the annual report specifically stated that Illinois corporations must have three directors.

¶ 13    In 2009, PTC's annual report listed Reverend Roff as the president, but not as a director. The report listed Jenkins-Brewer as a secretary and a director. Nelson was listed as the treasurer and as a director. Defendant Shaunté Brewer also was listed as a director.

¶ 14    Jenkins-Brewer prepared meeting minutes for PTC on February 21, 2010, in which she declared herself power of attorney for Reverend Roff and that Roff provided her with authority as CEO for the church. The minutes stated that "Pastor Roff, is incapacitated [at] this time, therefore having the authority to speak & appoint, I appoint as a [*sic*] Interim Pastor our asst. Minister Rev. Franklin Brooks, until such time as an official appointment be made." Jenkins-Brewer listed herself as "Power of Attorney," "CEO for [PTC]," and "Chief Director & Head CEO (a/k/a 'The Gate Keeper')." The minutes also stated that defendant "Fletcher Brewer who is in charge of all operations in and around the Church, be it known no changes, yes, nothing can be done in [PTC] unless it is cleared by him." In addition, "Connie Nelson also Treasurer and CEO of [PTC] any information regarding Pastor Roff the status of his health please contact Evang. Nelson or Myself." Reverend Roff died on March 5, 2010.

¶ 15    On March 28, 2010, PTC filed its annual report, which is signed by Shaunté Brewer as president. The report listed Jenkins-Brewer as the secretary, Nelson as the treasurer, Fletcher Brewer as a director, and defendant Robert McGriff as a director. Reverend Roff remained listed as PTC's registered agent. Annual reports filed thereafter do not include Nelson as an officer or director of PTC.

¶ 16    Jenkins-Brewer also prepared the minutes for the "Special Meeting of Directors" for PTC on May 9, 2010. The minutes listed as present for the meeting Shaunté Brewer, Fletcher Brewer, Nelson, Jenkins-Brewer, and McGriff. The resolution from the minutes stated that by unanimous vote, the board of directors gave Jenkins-Brewer, as corporate secretary and CEO, the authority

to execute and make any and all business transactions on behalf of PTC. The minutes were signed by Shaunté Brewer, Fletcher Brewer, Robert McGriff, and Nelson, although Nelson claimed she was not present at this meeting and that her signature was forged on the document.

¶ 17    The meeting minutes dated December 31, 2010 alleged that Nelson misappropriated $6000 from PTC's account and that the board of directors recommended and voted for her dismissal as treasurer. The meeting minutes of the same date state: "[t]his is to certify that Pastor Shaunté E. Brewer, 100% vested beneficial interest holder of [PTC] Have [*sic*] full power and authority to amend/adopt and appoint By written consent signed by Pastor Shaunté E. Brewer 100% beneficial owner and President & CEO." The minutes also reflected the appointment of a board of directors for 2011 consisting of Fletcher Brewer as vice president, overseer, and leadership director, Jenkins-Brewer as secretary and treasurer, and McGriff.

¶ 18    On the first Sunday of January 2011, Shaunté Brewer announced to plaintiffs from the pulpit of the PTC church that she was the new pastor and if members did not pay their tithes and offerings, that "we will lock the doors." After the second Sunday of January 2011, plaintiffs did not return to the PTC church because defendants had locked the doors.

¶ 19    On February 19, 2011, Nelson, through an attorney and as treasurer of PTC, sent correspondence to Shaunté Brewer, Jenkins-Brewer, and Fletcher Brewer, demanding possession of PTC property including the church rectory at 9521 South Prospect Avenue and the hall of worship located at 9535 South Prospect Avenue.

¶ 20    On February 22, 2011, plaintiffs filed their initial complaint against defendants for declaratory judgment and forcible detainer. Among other things, plaintiffs alleged that PTC is a "congregational" church, meaning that the selection of the pastor is accomplished through the vote of the church's members. Plaintiffs alleged that Shaunté Brewer is a 22-year-old special

education teacher and has no formal religious training and at no time did plaintiffs elect Shaunté Brewer to serve as the pastor of PTC. Plaintiffs also alleged they never elected or appointed Shaunté Brewer, Fletcher Brewer, Jenkins-Brewer, or McGriff as directors of PTC. Plaintiffs claimed that they elected Michael Campbell to be the pastor of the church and that plaintiffs were entitled to all property and assets of PTC. Count I of the complaint sought a declaratory judgment that, among other things, Michael Campbell was the duly elected pastor of the church, that Nelson is the duly appointed treasurer of the church, Shaunté Brewer is not the pastor of the church, and Shaunté Brewer, Jenkins-Brewer, Fletcher Brewer, and McGriff were not directors or officers of the church. Plaintiffs also sought forcible detainer, claiming actual possession of the hall of worship and church rectory.

¶ 21    On March 15, 2011, Jenkins-Brewer closed the PTC checking account at Standard Bank and withdrew the remaining $6033.90, made payable to herself. The 2011 annual report, dated March 18, 2011, lists Shaunté Brewer as president, Jenkins-Brewer as secretary and treasurer, and Fletcher Brewer, McGriff, and Rachel Edmonds as directors. Shaunté Brewer signed the annual report as president and she is listed as the registered agent. In April 2011, plaintiffs were each sent a letter purporting to terminate their memberships in PTC. Each letter was signed by all defendants.

¶ 22    On November 2, 2011, defendants filed a four-count verified counterclaim based upon the same underlying facts. Defendants filed a motion to dismiss count I of plaintiffs' complaint on October 25, 2013, arguing that the circuit court lacked subject matter jurisdiction to declare a "rightful" pastor of PTC and the makeup of the board of directors. Defendants, however, acknowledged that "a neutral principles analysis could be used to enforce bylaws that were proper, authentic governing documents." Defendants contended that PTC never operated

8

according to any set of written guidelines and, therefore, any bylaws purporting to direct the church's decision-making process were long-abandoned by nonuse. Whether Reverend Roff authorized any set of bylaws that ceded power to the general congregation was not a determination for the circuit court because it would require the court to delve into church doctrine in violation of the first amendment. On February 11, 2014, the circuit court dismissed count I of plaintiffs' complaint, but granted them leave to replead.

¶ 23    Plaintiffs filed an amended complaint on March 13, 2014, that generally alleged they were the rightful members of PTC, that defendants wrongfully locked them out of the PTC hall of worship and rectory, and that defendants, without authority, wrongfully installed Shaunté Brewer as pastor of PTC. Plaintiffs alleged that from PTC's founding and until his death on March 5, 2010, Reverend Roff exercised uncontested leadership over PTC's administration and alone defined the contours of PTC's theology. After Reverend Roff's death, in accordance with the bylaws and PTC's status as a congregational church, PTC members would hold an election to select a permanent succeeding pastor. Instead, the acrimony between the parties began when three of the individual defendants usurped control of PTC's assets, including the real property, bank accounts, two automobiles, and other personal property, by producing a fraudulent power of attorney purportedly executed by Reverend Roff before he died. This power of attorney allegedly sought to transfer control of PTC assets and operations to Fletcher Brewer and Jenkins-Brewer and appoint Shaunté Brewer as the successor pastor. Once plaintiffs learned of the existence of the PTC bylaws, which allegedly was concealed by Jenkins-Brewer, the members of PTC held a binding election during which they elected Michael Campbell as the succeeding pastor. Not recognizing the validity of the election, the individual defendants then prevented

9

plaintiffs' access to PTC real property and attempted to transfer the remaining assets to their newly formed church, the New PTC.

¶ 24    The amended complaint sought declaratory judgment in count I and forcible detainer in count II, alleging similar relief as in the initial complaint. Plaintiffs sought a judgment declaring, among other things, that (1) Michael Campbell is the duly elected pastor of the church and that Shaunté Brewer is not the pastor; (2) Nelson is the duly appointed treasurer of the church; (3) Sadie Brown, Henry Sykes, and Henry Wilson are the directors of the church; and (4) Shaunté Brewer, Jenkins-Brewer, Fletcher Brewer, and McGriff are not the directors or officers of the church. In count II, plaintiff sought actual possession of the real property of PTC and an order that defendants vacate and remove themselves from the church's property.

¶ 25    Defendants moved to dismiss count I of the amended complaint on June 12, 2014, presenting the same argument as their previously filed motion to dismiss. On September 24, 2014, the circuit court denied defendants' motion and ordered them to answer the amended complaint. On December 19, 2014, defendants filed an answer and counterclaims for tortious interference with contract, defamation *per se*, breach of fiduciary duty against Nelson, and civil conspiracy.

¶ 26    The circuit court conducted a bench trial from February 2 to February 6, 2015. On May 4, 2015, the parties filed their proposed findings of fact and conclusions of law and the court took the case under advisement.

¶ 27    On November 20, 2015, the circuit court entered a detailed order applying a neutral principles approach, finding that the questions to be decided were not ecclesiastical in nature and, therefore, deference to religious authority was not required, citing *Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶¶ 41-44. The court recognized that there are

10

cases where the deed, corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property, but this case did not fall into any of those categories.

¶ 28    As to plaintiffs' declaratory judgment claim, the circuit court found in favor of plaintiffs in part and against them. The court held, among other things, that (1) there is no properly constituted board of directors or properly elected or appointed officers for the church and that neither plaintiffs nor defendants are properly elected or appointed in such capacity; (2) the court had no opinion as to who is the rightful pastor because this question is religious in nature and one over which the court has no jurisdiction; and (3) plaintiffs and defendants have an equal right to the possession and control of church property pending election of a duly constituted board of directors.

¶ 29    In addition, the circuit court ordered the appointment of a custodian to secure the church's property for the benefit of plaintiffs and defendants, conduct an election for a properly constituted board of directors, bring the church's corporate governance documents into compliance with the statute, and take the necessary steps to ensure the orderly transition of church leadership. As part of this ruling, the court stated that "the current remaining plaintiffs and defendants shall each individually have a right to vote for an initial board of directors" (hereinafter, the "voting order"). The court also noted that the original PTC articles of incorporation provide for four board members. The court held that "the board should consist of five persons because a four-person board is subject to deadlock, and a deadlocked board is not in the best interest of the PTC" (hereinafter, the "board order").

¶ 30    On count II of the amended complaint, the circuit court found in favor of defendants on plaintiffs' claim for forcible detainer, concluding that defendants have an equal right of

11

possession and control of church property. The court also found in favor of plaintiffs on all of defendants' counterclaims. Finally, the court specifically stated in its order that "[t]his order is not final."

¶ 31    In the months following the entry of its November 20, 2015 order, the circuit court entered a number of orders concerning the progress of the custodian, the drafting of corporate governing documents, the election of an initial board, and other administrative issues that arose. From December 8, 2015 to March 29, 2016, the court entered orders regarding the appointment of the custodian, the parties' access to church property, preparation of the church's bylaws, payment of fees to the custodian, and selection of representatives from the parties to meet with the custodian.

¶ 32    On May 5, 2016, the circuit court entered an order amending the November 20, 2015 order to provide that plaintiffs and defendants "shall each designate two members to serve on the interim Board of Directors, and the fifth member shall be elected. Plaintiffs and Defendants shall each nominate one individual to stand for election."

¶ 33    The circuit court entered orders from May 10, 2016 to June 2, 2016 regarding the election of the fifth board member, agreed appointment of a fifth board member, payment of fees to the custodian, sharing of the premises by the parties, and admonishments to the parties to avoid conflicts or direct contact with each other.

¶ 34    On June 17, 2016, the circuit court entered an order requiring defendants to provide the custodian with three nominations for the fifth member of the interim board by June 21, 2016. Thereafter, the court entered various orders regarding the selection of a fifth interim board member, payment of fees to the custodian, upkeep of church property, and the parties' access to church property.

¶ 35 On December 8, 2016, the circuit court entered an order stating that "[t]he fifth member of the interim board of directors is Mary Sykes as selected by defendants from the list provided by plaintiffs in open court." The court entered various orders from March 17, 2017 to May 4, 2017 regarding the parties' access to church property, temporary restraining orders, and damage repair to church property.

¶ 36 On June 15, 2017, defendants, with new counsel, filed their "Emergency Motion to Vacate and to Stay," arguing that the board order and voting order entered on November 20, 2015 were unconstitutional and represented an abuse of discretion. Defendants argued that the circuit court's attempt to save the corporation was tainted because it unfairly favored one church over the other and that the determination of membership is an ecclesiastical function over which the court has no jurisdiction. Defendants contended that the court arbitrarily awarded plaintiffs' church 24 votes and defendants' church only 4 votes to elect an interim board of directors, as those voters were the remaining litigants subject to the November 20, 2015 order. In addition, defendants were forced to choose a fifth board member from plaintiffs' proffered board candidates. No affidavits were attached to defendants' motion.

¶ 37 On October 2, 2017, the circuit court entered its final order denying defendants' motion to vacate and to stay as untimely, without any evidentiary support, and without legal merit. The court also denied defendants' request to dissolve the church corporation as untimely. The court vacated its interlocutory orders regarding use of church property and discharged the custodian with final payment because the parties had selected an interim board and PTC's properly revised governing documents were filed with the Illinois Secretary of State.

¶ 38 Defendants filed a motion to reconsider on November 1, 2017. They made similar arguments to their motion to vacate and to stay, but attached affidavits. In the prayer for relief,

13

defendants requested that the circuit court vacate its orders of November 20, 2015, May 5, 2016, June 17, 2016, and October 2, 2017. In addition, defendants requested that they be allowed to proceed on a petition for dissolution of the corporation, which was pending in a different case.

¶ 39    On November 15, 2017, the circuit court denied defendants' motion to reconsider. Defendants filed a notice of appeal on December 13, 2017, challenging the orders of November 20, 2015, May 5, 2016, June 17, 2016, and October 2, 2017.

¶ 40                                              ANALYSIS

¶ 41    On appeal, defendants argue that the circuit court lacked subject matter jurisdiction to enter the November 20, 2015 board and voting orders, along with later orders implementing or enforcing them. Defendants contend that the court also lacked subject matter jurisdiction to restore plaintiffs to equal possession of PTC property. According to defendants, the court's stated justification for its efforts, rehabilitating the corporation, was utterly futile because the court was aware that the Brewer-led church and the Nelson-led church operated separately and would never voluntarily merge into one church. Finally, defendants argue that the court erred in concluding that *Muhammad v. Muhammad-Rahmah*, 363 Ill. App. 3d 407 (2006) authorized it to attempt to rehabilitate the PTC corporation.

¶ 42                                     Jurisdictional Analysis

¶ 43    Before addressing the merits, we *sua sponte* raise the question of whether this court has jurisdiction to consider this appeal considering defendants filed two successive posttrial motions. Jurisdiction gives a court the power to interpret and apply the law. *In re M.W.*, 232 Ill. 2d 408, 414-16 (2009). This court has the independent duty to consider whether it has jurisdiction over the appeal and to dismiss an appeal if we determine that our jurisdiction is wanting. *Archer*

14

*Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 539 (1984); *Geisler v. Everest National Insurance Co.*, 2012 IL App (1st) 103834, ¶ 44.

¶ 44     Circuit courts do not have authority to hear successive postjudgment motions. *Sears v. Sears*, 85 Ill. 2d 253, 258-59 (1981); *Won v. Grant Park 2, L.L.C.*, 2013 IL App (1st) 122523, ¶ 34. "Permitting a losing litigant to return to the trial court indefinitely would tend to prolong the life of a lawsuit, would interfere with the efficient administration of justice, and would lend itself to harassment." *Won*, 2013 IL App (1st) 122523, ¶ 34 (citing *Sears*, 85 Ill. 2d at 259).

¶ 45     In this case, defendants filed a posttrial motion to vacate and to stay, which specifically requested that the circuit court "reconsider the Memorandum Opinion and Order of November 20, 2015" and vacate the board and voting orders, among other things. In its November 20, 2015 order, the circuit court substantively decided counts I and II of plaintiffs' amended complaint, as well as all of defendants' counterclaims. The court specifically stated that the November 20, 2015 order was not final, however, because it needed to implement the remedies it had set forth under section 112.55 of the Act. After the court entered its October 2, 2017 order, specifically denoted as a "final order" and denying defendant's motion to vacate and to stay, defendants filed a motion to reconsider on November 1, 2017, again requesting that the court vacate the board and voting orders of November 20, 2015, but also sought review of the May 5, 2016, June 17, 2016, and October 2, 2017 orders. When the court denied the motion to reconsider on November 15, 2017, defendants filed their notice of appeal on December 13, 2017.

¶ 46     We consider whether defendants timely appealed in light of their failure to file a notice of appeal within 30 days' of the circuit court's October 2, 2017 final order. The answer to this question hinges on whether we consider the November 20, 2015 order as a final order. This court has jurisdiction to consider appeals only from final orders. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994). A

final judgment "determines litigation on the merits so that, if affirmed, the only thing remaining is to proceed with [its] execution." *People ex rel. Scott v. Silverstein*, 87 Ill. 2d 167, 171 (1981).

¶ 47 Here, the circuit court stated in its November 20, 2015 order that it "has subject matter jurisdiction over Plaintiffs' claim for declaratory judgment pursuant to section 2-701 of the Illinois Code of Civil Procedure (735 ILCS 5/2-701 (West 2014)) and over Plaintiffs' claim for forcible entry and detainer pursuant to section 9-102(a) of the Illinois Code of Civil Procedure (735 ILCS 5/9-102(a) (West 2014))," in addition to subject matter jurisdiction over defendants' counterclaims under " 'the general class of cases that the court has inherent power to hear and determine,' " quoting *In re Luis R.*, 239 Ill. 2d 295, 301 (2010). Under section 2-701(c) of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-701(c) (West 2014)), a circuit court can grant further relief based on its declaration of rights. This further relief is considered to be "incidental" to the declaratory judgment, the power to give it is part of the court's retained jurisdiction, and this power does not make the judgment non-final and non-appealable. *Indiana Insurance Co. v. Powerscreen of Chicago, Ltd.*, 2012 IL App (1st) 103667, ¶¶ 23-24. Indeed, under the unique facts of this case, section 112.55 of the Act states that when the circuit court orders corporate dissolution, as occurred in this case, the court "*may retain jurisdiction* and *** [a]ppoint a custodian." (Emphasis added.) 805 ILCS 105/112.55(a)(2) (West 2014). Although the circuit court ruled on the merits of plaintiffs' amended complaint and defendants' counterclaims on November 20, 2015, that order did *not* fix absolutely and finally the rights of the parties in the lawsuit because the court, among other things, ordered: (1) Jenkins-Brewer to file an accounting regarding the funds she withdrew from PTC's checking account; and (2) the appointment of a custodian for PTC as ancillary relief with the statutory authority to conduct an

16

election of an initial board of directors and draft corporate governing documents in compliance with the Act. See *id*.

¶ 48    In light of the circuit court's retained jurisdiction under section 112.55 of the Act, we find the November 20, 2015 order was not a final and appealable order. Therefore, defendants' June 15, 2017 motion to vacate and to stay was not a postjudgment motion triggering a *Sears v. Sears* issue. Furthermore, this case is not comparable to *Powerscreen* because the November 20, 2015 order was not final, as it did not fix absolutely and finally the rights of the parties. We find the circuit court entered its final order on October 2, 2017. Defendants filed a timely postjudgment motion to reconsider on November 1, 2017. The circuit court denied defendants' motion to reconsider on November 15, 2017.

¶ 49    Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017) governs when the notice of appeal must be filed in a civil case and requires that the notice of appeal be filed within 30 days after the entry of the final judgment, or when a timely posttrial motion directed against the final judgment has been filed, the notice of appeal must be filed "within 30 days after the entry of the order disposing of the last pending postjudgment motion directed against that judgment or order, irrespective of whether the circuit court had entered a series of final orders that were modified pursuant to postjudgment motions." Defendants complied with Rule 303 when they filed their notice of appeal on December 13, 2017. Accordingly, we have proper jurisdiction over this appeal.

¶ 50                                    Standard of Review

¶ 51    Defendants argue that we should apply a *de novo* standard of review because they are challenging whether the circuit court had subject matter jurisdiction to determine the case, which

is strictly a legal issue. Plaintiffs respond that this case is governed by the manifest weight of the evidence standard of review because this appeal follows a bench trial.

¶ 52    In *Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, the plaintiffs also brought a declaratory judgment action against the defendant church consisting of, among other things, disputes over church property and leadership. As here, following a bench trial, the circuit court, applying neutral principles of law, found in favor of the plaintiffs and against the defendants. The court in *Diocese of Quincy* applied the manifest-weight-of-the-evidence standard. *Id*. ¶¶ 38-39.

> "Although determining whether to apply a deference or neutral-principles approach may, on its face, appear to be strictly a question of law, the [circuit] court had to weigh the evidence presented in doing so. As the trier of fact, the [court] was in a superior position to judge the credibility of the witnesses and determine the weight to give their testimony." *Id*. ¶ 39.

We agree with *Diocese of Quincy* and likewise apply the manifest-weight-of-the-evidence standard. *Id*.

¶ 53    In a bench trial, the circuit court has the primary obligation to weigh evidence and determine disputed issues of fact, and we must defer to those findings of fact unless they are against the manifest weight of the evidence. *Klaskin v. Klepak*, 126 Ill. 2d 376, 389 (1989). "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007).

¶ 54                        First Amendment Analysis

¶ 55    Turning to the merits of this case, we determine whether the circuit court properly decided plaintiffs' claims under neutral principles of law, or whether the circuit court lacked jurisdiction under the ecclesiastic abstention doctrine pursuant to the first amendment to the United States Constitution (U.S. Const., amend. I). We conclude that the circuit court properly applied neutral principles of law and the ecclesiastic abstention doctrine does not apply. Therefore, the circuit court had proper subject matter jurisdiction to determine this case.

¶ 56    The first amendment to the Constitution of the United States provides, in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ***." U.S. Const., amend. I. The first amendment applies to state governments by incorporation through the fourteenth amendment (U.S. Const., amend. XIV). See *Stromberg v. California*, 283 U.S. 359, 368 (1931). The United States Supreme Court has held that freedom of religion is guaranteed not only to individuals, but also to churches in their collective capacities, which must have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952).

¶ 57    The ecclesiastic abstention doctrine is grounded in the first amendment. It had its genesis in *Watson v. Jones*, 80 U.S. 679 (1871), and the United States Supreme Court later incorporated it into its first amendment jurisprudence. See *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696, 710 (1976) (applying *Watson* in a first amendment case). *Watson* involved a fracture within the Walnut Street Church, a local congregation of the Presbyterian Church in the United States (PCUSA), a hierarchical polity overseen ultimately by a general assembly, the "highest judicatory" of the PCUSA. Hierarchical

churches refer to those "where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power or control more or less complete, in some supreme judicatory over the whole membership of that general organization." *Id*. at 722-23. In contrast, a congregational church is characterized as "when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." *Id* at 722.

¶ 58     The real property of the Walnut Street Church had been deeded to the church trustees for use in keeping with the fundamental laws of the PCUSA. According to these laws, the general assembly of the PCUSA possessed " 'the power of deciding in all controversies respecting doctrine and discipline.' " *Id*. at 682. In May 1865, the general assembly adopted a resolution that required members of the congregation who adhered to the concept of the divine character of slavery to "repent and forsake these sins." *Id* at 691. This declaration led the Walnut Street Church to split into pro-slavery and anti-slavery camps. Contending that this resolution was contrary to a provision in the constitution of the Presbyterian Church, the pro-slavery minority faction seized control of the church property and severed its affiliation with the PCUSA. The PCUSA general assembly responded by declaring the pro-slavery contingent illegitimate and excluding them from membership in the assembly. This declaration effectively designated the majority anti-slavery contingent as the true and legitimate Walnut Street Church and, therefore, the rightful owner of the church property. *Id*. at 692. After unsuccessful litigation in state courts, representatives of the anti-slavery majority faction instituted a diversity suit in federal court.

¶ 59    The *Watson* Court held that the controversy was inappropriate for adjudication by civil courts. *Id*. at 727. The Court found that "whenever the questions of discipline, or faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them ***." *Id*. As to congregational churches, however, the court had a separate rule of procedural deference for property disputes:

"In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property. The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation. This ruling admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization; for, if such was permitted, a very small minority, without any officers of the church among them, might be found to be the only faithful supporters of the religious dogmas of the founders of the church." *Id*. at 725.

¶ 60    The determining factor in applying the ecclesiastic abstention doctrine hinges upon the subject matter of the dispute. When the subject matter of a dispute is strictly and purely ecclesiastical in character, regardless of the polity of the church, the civil court cannot exercise jurisdiction, including matters that concern "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id*. at 733. "Accordingly, Illinois courts have generally refused to adjudicate cases requiring judicial interpretation of religious doctrine or church law where the governance structure is clearly hierarchical and the local group is clearly subordinate to the larger organization." *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 43 (citing *Stepek v. Doe*, 392 Ill. App. 3d 739, 754 (2009) and *Williams v. Palmer*, 177 Ill. App. 3d 799, 805 (1988)).

¶ 61    However, Illinois courts have adopted the neutral principles approach set forth in *Jones v. Wolf*, 443 U.S. 595, 603 (1979), whereby a court may objectively examine pertinent church characteristics, constitutions, bylaws, deeds, state statutes, and other evidence to resolve the matter as it would a secular dispute. *Stepek*, 392 Ill. App. 3d at 755 (citing *Hines v. Turley*, 246 Ill. App. 3d 405, 418 (1993)). In *Jones*, the United States Supreme Court recognized the neutral principles methodology as a constitutionally permissible way to resolve church property disputes. *Jones*, 443 U.S. at 604 (finding states are constitutionally entitled to adopt a neutral-principles-of-law analysis). As a result, courts may decide whether disputed property belongs to the local church or general church by reference to " 'objective, well-established concepts of trust and property law.' " *Aglikin v. Kovacheff*, 163 Ill. App. 3d 426, 432 (1987) (quoting *Jones*, 443 U.S. at 603).

¶ 62    "This approach may be applied in resolving property disputes, even with a hierarchical church organization, so long as the court does not decide a religious matter involving church

doctrine, polity, or practice." *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 45; see also *Clay v. Illinois District Council of the Assemblies of God Church*, 275 Ill. App. 3d 971, 976-77 (1995); *In re Marriage of Goldman*, 196 Ill. App. 3d 785, 793-95 (1990) (courts must apply neutral principles of secular law to avoid excessive entanglement with religious doctrine). "Simply put, if the analysis can be done in secular terms, the court should do so." *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 45.

¶ 63    In *People ex rel. Muhammad v. Muhammad-Rahmah*, 289 Ill. App. 3d 740, 744 (1997), the circuit court applied a neutral principles of law approach to determine whether the plaintiff had been properly removed as president and chairman of the board of directors of the mosque's not-for-profit corporation. The appellate court found that the circuit court was not required to examine religious doctrine or practice to resolve the issue. *Id*. at 744-45. The appellate court stated that:

> "[t]he corporation's bylaws and the statute under which it was organized clearly
> set forth the procedure for appointment and removal of directors, the notice
> requirements for directors' meetings, and other attendant corporate matters. These
> instruments constituted the rules that the members of the mosque chose to be
> bound by before the dispute arose." *Id*. at 745.

¶ 64    The appellate court concluded that "[t]he allegations in plaintiff's petition required the [circuit] court to decide only whether those procedures had been complied with, and not whether the plaintiff was living as a good Muslim. Thus, the [circuit] court was not required to interpret the Holy Qur'an or to rule on an ecclesiastical question." *Id*.

¶ 65    In this case, following the death of Reverend Roff, the members of the church divided themselves into two factions, each claiming to represent the true faith of the PTC church. The

Brewer faction of the church claimed to possess PTC's property, while the Nelson faction sought to recover possession of the church's property through legal action.

¶ 66    Here, similar to *Muhammad*, PTC first submitted itself to Illinois law when it filed its articles of incorporation as a not-for-profit corporation in 1965. The bylaws state that "[t]he corporation shall continuously maintain in the State of Illinois a registered office and a registered agent whose office is identical with such registered office ***." Article XI of the bylaws states that the board of directors "is the only doctrine-expressing law making authority of the church." In other words, the bylaws specifically contemplate that PTC maintains itself as an independent church with its own internal government and does not characterize itself as answering to a hierarchical church government.

¶ 67    The parties contested whether PTC is an independent and autonomous congregational church. In their amended complaint, plaintiffs alleged that PTC "is a 'congregational' Church, meaning the selection of the Pastor is by vote of the Members." In their answer, defendants denied this claim on the basis that it was a legal conclusion. They also denied that the church was ever intended or operated as a congregational church. In addition, defendants denied the authenticity of PTC's bylaws, which require the body of PTC to elect a pastor.

¶ 68    At trial, however, the bylaws were authenticated by the senior vice president and senior trust officer at Standard Bank, who testified that the bylaws were included with the land trust file at the bank and that the bank had requested the bylaws be included in the file to be prepared in the event of succession of church leadership. Defendants presented no evidence at trial to properly refute the organization of PTC as a congregational church. Regardless of the church's polity, if the circuit court was not required to examine religious doctrine or practice when

making its determination, it could resolve the case under neutral principles of law. *Jones*, 443 U.S. at 604; *St. Mark Coptic Orthodox Church v. Tanios*, 213 Ill. App. 3d 700, 713-14 (1991).

¶ 69    We find the circuit court in this case properly applied the neutral principles of law as it found both parties have an equal right to PTC property and carefully applied section 112.55 of the Act to remediate the church's corporate governance. The court specifically refused to issue an opinion as to who is the rightful pastor because that question is religious in nature. Instead the court limited its findings to corporate reorganization by examining PTC's articles of incorporation, bylaws, other corporate governing documents, the land trust, and pertinent state statutes to resolve the matter. *Jones*, 443 U.S. at 603.

¶ 70    First, the circuit court found that there was no properly constituted PTC board of directors at the time the controversy between the parties arose. The existing corporate documents failed to comply with Illinois statutory requirements. The court concluded that Shaunté Brewer lacked authority to execute her leadership as president of PTC because, under the Act, she was never "elected or appointed by the board of directors or chosen in such other manner as may be prescribed by the bylaws." 805 ILCS 105/108.50 (West 2014). Therefore, she lacked authority to execute any PTC annual report because she was not an "authorized officer" under the Act. *Id*. § 114.05(g).

¶ 71    The circuit court also noted that the PTC bylaws contained no provision for selecting a new president when Reverend Roff died. Because only the president is empowered by the PTC bylaws to appoint officers, there was no manner specified in the bylaws for selecting officers after Reverend Roff died. The court concluded that the PTC governing documents failed to comply with the Act's requirements that officers "may be elected or appointed by the board of directors or chosen in such other manner as may be prescribed by the bylaws." *Id*. § 108.50(a).

25

¶ 72    In light of the failure of PTC's governing documents to comply with the Act, the circuit court found that PTC was subject to corporate dissolution. However, the court stated that outcome would not be substantially just or in the best interests of PTC. Instead, the court applied section 112.55 of the Act by ordering the appointment of a custodian, which states:

> "A custodian may be appointed in the discretion of the court if it appears that such action by the court will remedy the grounds alleged by the complaining director or member entitled to vote to support the jurisdiction of the court under Section 112.50 [(ground for dissolution)] of this Act. Subject to any limitation which the court imposes, a custodian *shall be entitled to exercise all the powers of the corporation's board of directors and officers to the extent necessary to manage the affairs of the corporation* \*\*\* in furtherance of its purposes, until such time as such custodian shall be removed by order of court or, unless otherwise ordered by the court, removed by a vote of the members sufficient either to elect a majority of the board of directors or, if greater than majority voting is required by the articles of incorporation or the bylaws, to elect the requisite number of directors needed to take action. Such powers may be exercised directly, or through or in conjunction with the corporation's board of directors or officers, in the discretion of the custodian or as the court may order." (Emphasis added.) *Id*. § 112.55(c).

¶ 73    We agree that this case is analogous to *Muhammad*, in which, during a second appeal, the court remanded the case and ordered the appointment of a custodian under section 112.55 of the Act to "remedy the grounds alleged by the complaining party." *Muhammad v. Muhammad-Rahmah*, 363 Ill. App. 3d 407, 417 (2006). The court found the appointment of a custodian was in "the best interests of the corporation, and not those of any warring factions." (Internal

quotation marks omitted.) *Id*. Indeed, "Illinois courts may initiate such an appointment as a remedy 'in times of corporate strife to help guide the company through crisis toward the goal of stabilization and prosperity.' " *Id*. (quoting *Abreu v. Unica Industrial Sales, Inc.*, 224 Ill. App. 3d 439, 443 (1991)). In *Muhammad*, "the circuit court could reach no other conclusion than the one it did, *i.e.*, that plaintiffs did not have any more legitimate claim to the status of board members than defendants did." *Id*. at 418-19. Therefore, the *Muhammad* court concluded that the denial of the plaintiff's petition for declaratory judgment was not in error, but that proper resolution of the case required the appointment of a custodian under section 112.55 of the Act. *Id*. at 419.

¶ 74    In this case, we find that the circuit court properly applied neutral principles of law in its findings to prevent the dissolution of PTC's corporation through the appointment of a custodian under section 112.55 of the Act. This determination did not involve interpretation of religious doctrine and we find the court objectively examined pertinent church governing documents, state statutes, the land trust documents, and other evidence to resolve the matter as it would in a secular dispute. *Jones*, 443 U.S. at 603-04; *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 44; *Muhammad*, 289 Ill. App. 3d at 744-45. Accordingly, we conclude that the circuit court had proper subject matter jurisdiction to make its findings. *Id*. Furthermore, we find that the circuit court did not err in concluding that the *Muhammad* case authorized it to attempt to rehabilitate the PTC corporation.

¶ 75    We find *Muhammad* is analogous to this case, but moreover, the Act provided the circuit court with the necessary statutory authority to remediate PTC's corporate governance through the appointment of the custodian. 805 ILCS 105/112.55 (West 2014). PTC submitted itself to this statutory authority as early as 1965 when it filed its first set of articles of incorporation. Section 112.55(c) of the Act imbued the appointed custodian with the statutory authority to elect

an initial board of directors and draft corporate governing documents in compliance with the Act. Through the entry of various orders following the entry of the initial posttrial order on November 20, 2015, the circuit court, using its retained jurisdictional capacity, remediated the corporate governance of PTC as provided in section 112.55. *Id*. The circuit court properly used this statutory remedy to resolve the parties' claims, allowing the PTC corporation to orderly transition its church leadership and comply with statutory corporate governance requirements.

¶ 76                                          CONCLUSION

¶ 77     The circuit court had proper subject matter jurisdiction to resolve the issues in its disposition of this case and its decision was not against the manifest weight of the evidence. We affirm the judgment of the circuit court of Cook County.

¶ 78     Affirmed.